Katherine BARNHART, for Herself and All Others Similarly Situated *v.* CITY OF FAYETTEVILLE, Arkansas; City of West Fork, Arkansas; Washington County, Arkansas; Northwest Arkansas Resource Recovery Authority; Union National Bank, Little Rock, Arkansas; and Financial Guaranty Insurance Company

94-969                                              900 S.W.2d 539

Supreme Court of Arkansas
Opinion delivered June 26, 1995
[Rehearing denied September 11, 1995.*]

*Jesson, C.J., not participating.

198

200

*E. Kent Hirsch, P.A.*, by: *E. Kent Hirsch; Pearson, Evans & Chadwick*, by: *Marshall Dale Evans*; and *George K. Cracraft*, for appellant.

*Niblock Law Firm*, by: *Walter R. Niblock* and *Katherine C. Gay*, for appellee City of Fayetteville.

*Friday, Eldredge & Clark*, by: *William H. Sutton, Larry W. Burks*, and *Jeffrey H. Moore*; and *Cravath, Swaine & Moore*, by: *Robert S. Rifkind* and *Robert H. Baron*, of counsel.

ROBERT H. DUDLEY, Justice. The City of Fayetteville imposed a sanitation charge of $2.02 on each residence to pay a bonded indebtedness owed by the Northwest Resource Recovery Authority. Katherine Barnhart filed suit in chancery court alleging that the levy is a tax and an illegal exaction. The chancellor upheld the levy. We reverse and remand. The tax constitutes an illegal exaction.

On August 30, 1980, the Northwest Arkansas Resource Recovery Authority was formed pursuant to the Joint County and Municipal Solid Waste Act. *See* Ark. Code Ann. § 14-233-101 to -121 (1987). The Authority was formed to construct and operate a waste disposal incineration plant for the cities of Fayetteville and West Fork and the County of Washington. The affairs of the Authority are directed by a board of directors composed of nine members, and, at all times material to this case, seven of the directors were also directors of the City of Fayetteville.

On December 31, 1985, the Authority issued bonds that were payable solely from revenues derived from the incineration project. The proceeds from the issue were made available to the Authority, but were placed in escrow because much of the development work such as site selection, contracts, and impact studies had not been completed.

By December 1986, the Authority had developed the project to the point that the proceeds could be fully utilized. The Authority let contracts for the construction of the incineration plant, and agreements were entered into with the participating governments for use of the incinerator service. Under these contracts, Fayetteville would deliver in excess of 33,000 tons of waste per year, and West Fork and Washington County would deliver 1,800 tons of waste per year. The two cities and the county agreed to pay tipping fees, or direct charges for the delivery of waste, from their sanitation funds, and agreed to pass the cost on to their sanitation users. The tipping fees were to be calculated so that they would pay all of the operating costs of the incineration plant and all fees, principal, and interest on the Authority's outstanding revenue bonds.

The Authority chose to remarket the bonds as fixed rate bonds and, to get a better rate of interest, applied to appellee Financial Guaranty Insurance Company for an insurance policy

that would pay the bond debt in event of default by the Authority. As a condition for the issuance of the policy to the Authority, the insurance company required eighteen changes in the existing contracts with the two cities and the county. Up to this time, the Authority had issued the original bonds, received the proceeds from the issue, and was solely responsible for the payment of the obligation. The changes mandated by the insurance company would require the City of Fayetteville to unconditionally guarantee to collect sanitation fees from its citizens and then to pay over from its sanitation fund a sufficient amount of funds to pay all of the Authority's obligations on the fixed rate bonds. This requested unconditional guarantee would also include an obligation by the City of Fayetteville to pay all unpaid tipping fees of West Fork and Washington County. The guarantee would be absolute and require that tipping fees be collected and paid over to the Authority from sanitation funds without setoff, abatement, credit, or other reduction so long as the bonds remained unredeemed. Under the mandated changes, the City of Fayetteville could not terminate the agreement even if the Authority were in complete default, unless the trustee was furnished sufficient funds with which to redeem the bonds issued. Finally, it was required that the trustee of the bondholders would be made a third-party beneficiary of the amended contract with the right to sue for its enforcement. The requested changes were made in a Waste Disposal Agreement executed on December 22, 1986.

The city attorney for Fayetteville certified to the insurance company that the amendments had been made, were enforceable, and that Fayetteville was obligated to pay not only its own tipping fees but those of West Fork and Washington County as well, regardless of whether the project was completed or functional and regardless of whether the Authority provided alternative facilities. The fixed rate bonds, designated "Series 1985 Bonds," were re-issued on December 30, 1986. The bonds, in accordance with Ark. Code Ann. § 14-233-112(a), provided on their face that they were obligations of the Authority and that they were not the indebtedness of any municipality.

Public opposition to the project grew soon after construction was begun in 1987. On March 8, 1988, the Fayetteville Board of Directors conducted a non-binding referendum on continuing with construction of the incineration plant, and a majority voted

against continuing with the project. By this time, over $6,000,000 had been spent on the project. On March 11, 1987, the Authority voted to discontinue the project and notified the contractor to stop work. On March 15, 1987, the bond trustee, appellee Union National Bank, notified the Authority and the Financial Guaranty Insurance Company that a default had occurred.

On August 15, 1989, the City of Fayetteville passed Ordinance No. 3444 which imposed the fee of $2.02 per residence, with higher fixed fees for businesses, for the purpose of "absorbing termination cost and retiring the bonds issued." The fixed fees are to be in effect until January 1, 2003. The rate of $2.02 per residence was calculated as the amount required to pay all fees, principal, and interest on the outstanding bonds of the Authority. This fee is an addition to the charge for sanitation services actually provided.

On August 29, 1989, appellant filed this illegal exaction suit. This suit does not question whether the bonds are valid obligations of the Authority, and does not question whether the bonds are covered by the policy of insurance the Authority purchased from Financial Guaranty Insurance Company. The only issue before us is whether the fee levied on each residence and business in Fayetteville constitutes an illegal exaction.

Appellant's first point of appeal is that Fayetteville Ordinance No. 3444 imposes an illegal tax because, on its face, it purports to levy a fee or tax on each residence in Fayetteville to pay the long-term debt of the Authority. The argument is well taken. Act 699 of 1975, the act under which the bonds were issued provides in material part:

> It shall be plainly stated on the face of each bond that has been issued under the provisions of this chapter, that the bonds are obligations only of the sanitation authority, and that in no event shall they constitute an indebtedness for which the faith and credit of its member municipalities or counties or any of its revenues are pledged.

Ark. Code Ann. § 14-233-112(a) (1987).

The chancellor ruled that "the bonds were issued by authority per Act 699 of 1975 to provide *no recourse against Fayetteville.*" (Emphasis supplied.) There is no cross-appeal from that

ruling. Thus, before Ordinance No. 3444 was passed, the bonds were not the obligation of the City of Fayetteville and did not provide for recourse against the City of Fayetteville. They were the obligations of the Authority, and they were payable solely from revenue derived from the operations of the Authority.

Ordinance No. 3444 declares that the fee is for "absorbing terminating cost and retiring the bonds issued." The Ordinance, in effect, changed the bonds from being payable solely from funds derived from the revenue of the Authority to being payable from a fee on residences and businesses in Fayetteville.

██ Municipal corporations have only those taxing powers delegated to them by statute or by the Arkansas Constitution. *City of Little Rock* v. *Cash*, 277 Ark. 494, 644 S.W.2d 229 (1982), *cert. denied*, 462 U.S. 1111 (1983). The levy of an unauthorized or illegal tax by a city constitutes an illegal exaction, and relief for such is provided in Article 16, section 13. *Id.* at 501, 644 S.W.2d at 231. We have long held that a city is not authorized to pay or assume the obligations of a separate governmental entity which exists outside that city. *Russell* v. *Tate*, 52 Ark. 541, 13 S.W. 130 (1889); *Halbut* v. *Forrest City*, 34 Ark. 246 (1879).

█ The Authority is a separate governmental entity. Section 14-233-105 of the Arkansas Code Annotated provides that the Authority is "a public body and a body corporate and politic." Ark. Code Ann. § 14-233-105(c)(3). Section 14-233-107 confers on the Authority "perpetual succession" as a body politic with power to adopt rules, regulations, and policies for conducting its affairs. *Id.* § 14-233-107(1). The Authority can sue and be sued in its own name, procure insurance, and hire employees. *Id.* § 14-233-107(3), (7), & (8). Section 14-233-109 confers on the Authority the power to issue revenue bonds and provides the terms and conditions of those bonds. *Id.* Section 14-233-112 forbids the Authority from accepting a pledge of municipal revenue as security for its bonds. *Id.* § 14-233-112(a).

█ Even though the City of Fayetteville had no obligation to pay the bonds, it assumed the debt of the Authority, a separate governmental entity, and levied a charge against the residences to pay the Authority's debt. The City was without authority to levy a fee that was to pay the long-term debt of the Authority. Thus, the Ordinance imposing the charge was unlawful.

■ ■ The chancellor ruled, in part, that the charge was valid because it was a fee and not a tax. Appellant assigns the ruling as error. Under the terms of the Ordinance, each residence in Fayetteville is assessed the monthly surcharge until the year 2003, and, in addition, each residence is assessed a fee for the sanitation services that are actually provided. Fayetteville was neither acquiring, owning, maintaining, nor operating the plant. It was acquired, owned, to be maintained, and to be operated by the Authority. The surcharge is not related to providing sanitation services in Fayetteville, but instead is a fee imposed to pay the debt for the Authority's acquisition of the plant. Since the surcharge is not related to services provided by Fayetteville, it is not a "fee," but rather is a "tax." A governmental levy of a fee, in order not to be denominated a tax by the courts, must be fair and reasonable and bear a reasonable relationship to the benefits conferred on those receiving the services. *City of Marion* v. *Baioni*, 312 Ark. 423, 850 S.W.2d 1 (1993); *City of North Little Rock* v. *Graham*, 278 Ark. 547, 647 S.W.2d 452 (1983). There are exceptions to the foregoing rule, *see City of Little Rock* v. *AT&T Communications of the Southwest, Inc.*, 318 Ark 616, 888 S.W.2d 290 (1994), but they are not applicable to this case. The fact that the Ordinance labels the exaction a "fee" rather than a "tax" is not binding. Courts look at the true character of the levy to determine whether it is a fee or a tax. *Baioni*, 312 Ark. at 425, 850 S.W.2d at 2. The true character of the levy in this case is a tax because it is imposed solely to retire the debt of the Authority.

■ Appellees contend that charge is a fee because it comes from a special fund, but the special-fund doctrine has no application to this case. The doctrine recognizes that the prohibition against a city's lending of its credit does not apply when a city owns a revenue-producing facility, secures the payment of debt solely with revenues from that asset, and impairs neither the city's credit nor its revenue. *Snodgrass* v. *City of Pocahontas*, 189 Ark. 819, 75 S.W.2d 223 (1934); *McCutchen* v. *City of Siloam Springs*, 185 Ark. 846, 49 S.W.2d 1037 (1932). Here, under the terms of the Ordinance the debt is not to be paid solely from the Authority's revenues. Rather, it is to be paid by a tax on the residences and businesses of Fayetteville.

■ While a city can assess a fee for providing a service

without obtaining public approval, a tax cannot be levied unless it has received approval by the taxpayers. Ark. Code Ann. § 26-73-103(a) (1987). The voters did not approve this tax. Thus, the surcharge constituted an illegal tax.

The chancellor ruled that the Ordinance was valid on the additional ground that the Waste Disposal Agreement unconditionally provided that Fayetteville would pay the Authority's debt, and the Ordinance was enacted pursuant to the Agreement. Appellant contends that the ruling is in error because the City Board did not have the authority to execute the unconditional guarantee contained in the Waste Disposal Agreement, and the Board of Directors' action in doing so was *ultra vires* and void. Again, the argument is meritorious.

The chancellor found:

> [T]he [Waste Disposal] agreement further required Fayetteville to unconditionally guarantee the total debts of the authority, which would include the possible default of West Fork and Washington County, *each being separate governmental agencies, or even in the current event of termination of the project with no receipt of services to Fayetteville.* (Emphasis supplied.)

There is no cross-appeal from the ruling. Thus, it is undisputed that under the terms of the Waste Disposal Agreement, Fayetteville was unconditionally required to pay all of the debt of the Authority, including debt incurred as a result of default by the City of West Fork or Washington County, even if Fayetteville received no services from the Authority. This was in violation of Article 16, section 1, which provides that no municipality shall ever lend its credit for any purpose whatsoever. The foregoing section has been superseded in part by Amendments 62 and 65, to allow local governments to issue bonds, but the later amendments are not applicable to this case; thus, the part of Article 16, section 1, relied on by appellant is still valid. *City of Hot Springs v. Creviston*, 288 Ark. 236, 713 S.W.2d 230 (1986). Therefore, Fayetteville's agreement to unconditionally guarantee the obligations of West Fork and Washington County was in violation of the constitution, was unauthorized, and was *ultra vires*.

The agreement was invalid for a second reason. Under the terms of the Waste Disposal Agreement, the Authority is not obligated to accept or dispose of any waste, nor is it required to supply an alternative facility, and the City of Fayetteville expressly gave up any right of relief in event of default by the Authority. Yet the City of Fayetteville is obligated to pay a fixed sum per month, "without abatement, offset or deduction whatsoever," and without regard to services being provided by the Authority. The Waste Disposal Agreement denies the City the right to seek redress, abatement, or termination for any reason so long as the bonds remain unredeemed. The Fayetteville city attorney certified to the Financial Guaranty Insurance Company, in part:

> [T]he documents have been executed, delivered and are binding and enforceable in accordance with their terms, and 401(d) of the project disposal contract unconditionally obligates the City of Fayetteville to charge, collect and pay from sanitation fund revenue all obligations of "401(c) of said contract to the extent not actually paid by other parties, *regardless of whether the facility (as defined in the contract) is completed or is functioning or whether the Authority has provided alternative facilities.* (Emphasis supplied.)

Contracts of this nature have been referred to as "dry hole" contracts and have been declared void and *ultra vires* in other jurisdictions.

In *Chemical Bank* v. *Washington Pub. Power Supply Sys.*, 666 P.2d 329 (Wash. 1983), the court considered a contract which was similar to the one at issue. There, municipalities contracted to purchase power from a power authority and agreed to pay fees to be calculated on the cost of production which would be sufficient to pay the power authorities' bonded indebtedness "whether or not the projects were completed, operable or operating." The obligation was "unconditional and not subject to any reduction whether by offset, or otherwise" and was not conditioned upon the performance by the power agency. *Id.* at 332.

The initial issue determined by that court was whether the contract came within the municipalities' authority to "purchase electric power." In holding that it did not come within that authority the court wrote:

> Initially we must decide whether the agreement is authorized as a purchase of electricity by the participants. As discussed in greater detail *infra*, the purchase of "project capability" under this agreement is essentially an unconditional guarantee of payments on the revenue bonds, secured by a pledge of the participants' utility revenues, in exchange for a share of any power generated by these projects. The agreement expressly provides for the possibility that no electricity will be generated and that participant payments will be due even if the project is not completed.

*Id.* at 335.

In *Asson* v. *City of Burley*, 670 P.2d 839 (Id. 1983), the Idaho court considered an almost identical contract with the same power authority. In holding the contract invalid that court wrote:

> [W]e can find no statutory authorization for the purchase of project capability "where such purchase comprehends the payment of long-term indebtedness for which no power may be supplied, and for which no ownership interest is acquired. The municipality is neither acquiring, owning, maintaining, or operating a plant, nor purchasing electrical power. It is underwriting another entity's indebtedness in return for merely the possibility of electricity.

*Id.* at 850.

In *Vermont Dep't of Pub. Serv.* v. *Massachusetts Mun. Wholesale Elec. Co.*, 558 A.2d 215 (Vt. 1988), the court considered a contract which it termed "virtually identical" to those before the Washington and Idaho courts as above set out. *Id.* at 218. It also reached the conclusion that such a contract was not for the "purchase of electricity;" therefore it was *ultra vires* and void. *Id.* The court pointed out that the authority to purchase or obtain power did not mean that the municipalities "are free to enter into speculative contracts that impose unconditional long term obligations in the face of 'if any' disclaimers." *Id.*

▇▇ In the Waste Disposal Agreement, Fayetteville agreed to pay the outstanding bonded indebtedness of the Authority without regard to whether the Authority unilaterally, and without cause, terminated the sanitation services before the bonds

were paid with revenue generated by the Authority. A municipality's authority to contract for the purchase of a service does not carry with it the power to incur long-term obligations for which no services may be supplied. This was not a contract for the purchase of sanitation services; rather, it was a contract to pay long-term obligations of a separate governmental entity even when the municipality would not receive sanitation services. Thus, it was *ultra vires* and void.

The trial court additionally upheld the Waste Disposal Agreement on the grounds of ratification, estoppel, and unjust enrichment. Appellant's assignment of the ruling as error is also well taken. We have long made a distinction between a contract with a municipality that is *ultra vires* in the general sense and, because it is wholly outside the authority of the municipality to make such a contract under any circumstances, is void *ab initio, Town of Newport* v. *Batesville & Brinkley Ry. Co.*, 58 Ark. 270, 24 S.W. 427 (1893), and a contract that is *ultra vires* in the limited sense because the power to contract was merely exercised irregularly and thus can be ratified. *Blount* v. *Baker*, 177 Ark. 1162, 9 S.W.2d 802 (1928). In this case the dry hole contract to pay the debts of West Fork and Washington County was outside the authority of the municipality to enter; therefore it was *ultra vires* and void *ab initio*, and not subject to ratification. *Lamar Bath House Co.* v. *City of Hot Springs*, 229 Ark. 214, 315 S.W.2d 884 (1958), *appeal dism'd* 359 U.S. 534 (1958). In summary, we hold that Ordinance No. 3444 was unlawful, the Waste Disposal Agreement was void *ab initio*, and the surcharge is an illegal exaction.

Appellee Financial Guaranty Insurance Company asks that, if we hold that the fee is an illegal exaction as we do, we declare it is an illegal taking of the bondholders' property. The argument was not raised below. While we do not consider an appellant's arguments which are raised for the first time on appeal, we will affirm a trial court for a reason not specified by the trial court. However, here appellees seek something more than they received below; they seek a ruling that this action constitutes an illegal taking of the bondholders' property and such a holding would necessarily entitle the bondholders to damages for the illegal taking. Appellees did not receive that relief in the trial court. An appellee must give notice of cross-appeal in order to obtain

affirmative relief. *Moose* v. *Gregory*, 267 Ark. 86, 590 S.W.2d 662 (1979). Since notice of cross-appeal was not given, we are precluded from granting any affirmative relief not given by the trial court. Further, there is no showing that Financial Guaranty Insurance Company has standing as a bondholder.

Reversed and remanded for proceedings consistent with this opinion.