Mr. Larry Dickerson, Executive Secretary Arkansas State Highway Employees Retirement System P.O. Box 2261 Little Rock, Arkansas 72203
Dear Mr. Dickerson:
This is in response for your request for an opinion on the authority of the Arkansas State Highway Employees' Retirement System to make certain loans in the investment of its assets. Specifically, you indicate that the Arkansas State Highway Employees' Retirement System or ("ASHERS"), is seeking certification as an approved lender under the USDA Business and Industry Guaranteed Loan Program. You note that this certification would allow ASHERS to receive USDA guarantees on certain loans that it makes. You note, however, that after reviewing a proposal in this regard, the USDA's Office of General Counsel has requested a legal opinion from my office addressing ASHER's legal authority to operate a lending program under state law.
RESPONSE
The question you have posed is a very broad one. The answer to the question of whether ASHERS has the authority to operate a "lending program under state law" will in large part depend upon the nature of the "lending program." You have provided no facts in this regard. In my opinion, the only possible authority ASHERS could have to operate a "lending program," would be in the investment of its system assets. It may be debated whether this action can be fairly characterized as the operation of a "lending program." The investment of such assets is governed by various state laws, and is sometimes impacted by constitutional provisions, each of which will be discussed below. I must note, however, that the legality of any particular investment of System funds must be analyzed with reference to all the attendant facts. I can come to no definitive conclusions as to the legality or constitutionality of particular investments under state law without reference to such facts.
As an initial matter it is helpful to mention the relevant federal law. The relevant federal regulations implementing the U.S. Department of Agriculture's "Business and Industry Guaranteed Loan Program" provide, if a prospective lender is not a "traditional lender," that such lenders still may be considered for eligibility to become a guaranteed lender provided the USDA determines "that they have the legal authority tooperate a lending program and sufficient lending expertise and financial strength to operate a successful lending program." 7 C.F.R. 4279.29(b) (Emphasis added). This same regulation requires such a lender to:
 (i) Have a record of successfully making at least three commercial loans annually for at least the most recent three years, with delinquent loans not exceeding 10 percent of loans outstanding and historic losses not exceeding 10 percent of dollars loaned, or when the proposed lender can demonstrate that it has personnel with equivalent previous experience and where the commercial loan portfolio was of a similar quantity and quality; and
 (ii) Have tangible balance sheet equity of at least seven percent of tangible assets and sufficient funds available to disburse the guaranteed loans it proposes to approve within the first six months of being approved as a guaranteed lender.
The state law applicable to the investment of ASHERS assets must begin with a review of A.C.A. § 24-3-402, which provides as follows:
 (a) The Boards of Trustees of the State Police Retirement System, the Arkansas Public Employees' Retirement System, the Arkansas Teachers' Retirement System, the Arkansas State Highway Employees' Retirement System, and the Arkansas Judicial Retirement System shall have full power to invest and reinvest the moneys of the respective systems and to hold, purchase, sell, assign, transfer, or dispose of any of the investments so made as well as the proceeds of the investments and moneys.
 (b) However, the investments and reinvestments shall only be made in accordance with the prudent investor rule set forth in this subchapter.
The "prudent investor rule" referred to above, is now codified primarily at A.C.A. §§ 24-3-417 and 418 (Supp. 1999), which provide, respectively, in pertinent part as follows:
 (a) Except as otherwise provided in subsection (b) of this section, trustees[1] who invest and manage trust assets owe a duty to the beneficiaries of the trust to comply with the prudent investor rule set forth in this subchapter.
 (b) The prudent investor rule, a default rule, may be expanded, restricted, eliminated, or otherwise altered by the provisions of a trust. Trustees are not liable to a beneficiary to the extent that the trustees acted in reasonable reliance on the provisions of the trust.
* * *
 (a) Trustees shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this standard, the trustees shall exercise reasonable care, skill, and caution.
* * *
 (e) Trustees may invest in any kind of property or type of investment consistent with the standards of this subchapter. [Emphasis added.]
The authority granted the Board of Trustees of the Arkansas State Highway Employees' Retirement System is very broad. It may invest the system assets in "any kind of property or type of investment" so long as the investment is consistent with the subchapter quoted from above. Presumably, the investment made by the System through a USDA guaranteed loan would be evidenced by some type of note or obligation to pay, executed by the recipient of the loan proceeds, which would bear interest and thus return income to the system. This type of "investment" as long as consistent with the prudent investor rule and/or provision of an applicable trust, would appear to fall within the very broad authority of ASHERS to invest its funds under A.C.A. §§ 24-4-401 — to 426. The remaining question is whether such an investment would transgress any prohibition in the Arkansas Constitution.
Various constitutional provisions may be implicated depending upon the exact nature of the investment or "loan" contemplated. The constitutional provision most relevant to the operation of a "lending program" under state law is Arkansas Constitution, art. 16, § 1, which provides that:
 Neither the State nor any city, county, town or other municipality in this State shall ever lend its credit for any purpose whatever; nor shall any county, city or town or municipality ever issue any interest bearing evidences of indebtedness, except such bonds as may be authorized by law to provide for and secure the payment of the indebtedness existing at the time of the adoption of the Constitution of 1874, and the State shall never issue any interest-bearing treasury warrants or scrip.
An initial question may arise as to whether the funds held by ASHERS are subject to this prohibition. The courts of some states have held in analogous contexts that such funds are held in trust for prospective retirees and are thus not state or public funds to which such constitutional restrictions are applicable. See e.g., Louisiana StateEmployees' Retirement System v. State, 423 So.2d 73 (La. 1982). The majority position, however, appears to be to the contrary. See e.g.,State ex rel. Gainer v. West Virginia Board of Investments,194 W.Va. 143, 459 S.E.2d 531 (1995); ICMA Retirement Corporation v.Executive Department, 92 Or. App. 188, 757 P.2d 868 (1987); Board ofTrustees of the Public Employees' Retirement Fund of Indiana v. Pearson,459 N.E.2d 715 (Ind. 1984); and Almond v. Day, 197 Va. 782, 91 S.W.2d 660 (1956).
Assuming the applicability of the constitutional provision quoted above, a question arises as to what is encompassed within the meaning of a loan of the state's "credit." The issue raised is whether this prohibition also precludes the direct loaning of the state's "money." There appears to be no controlling decision of the Arkansas Supreme Court on the question, although the available Arkansas precedents will be discussed below. Courts of other jurisdictions are split on the issue, with an apparent majority holding that a loan of a state's money is not within prohibitions such as art. 16, § 1. Each of these cases also requires, however, that such loans be for a "public purpose." Illustrative of the latter view is the following language from Nelson v. Marshall,94 Idaho 726, 497 P.2d 47 (1972):
 The appellant contends that the loaning of state funds to a private individual violates the following portion of article 8, section 2 of the Idaho Constitution: `The credit of the state shall not, in any manner, be given, or loaned to, or in aid of any individual * * *.' This contention must be rejected, for two reasons: (1) a loan of state funds is not a loan of state `credit'; and (2) the loan made here is not `in aid of any individual' within the meaning of the constitutional provision. This provision was recently discussed in Engelking v. Investment Board, 93 Idaho 271, 458 P.2d 213 (1969), in which case this Court approved the loaning of state endowment funds to private corporations, as follows:
 `(The loaning of credit clause of article 8, section 2) prohibits only loaning of the State's credit. Idaho Const. art. 8, s 2, does not prohibit the loaning of State funds. The word `credit' as used in this provision implies the imposition of some new financial liability upon the State which in effect results in the creation of State debt for the benefit of private enterprise. This was the evil intended to be remedied by Idaho Const. art. 8, s 2, and similar provisions in other state constitutions. Yet that particular evil is not presented by the investment of existing funds of the State, for no new State debts are created by such action.'
497 P.2d at 52.
In the Engelking case, cited in Nelson above, the court also stated that:
 The loaning of endowment fund assets envisioned by S.B. 1277 involves an effort to aid the State by increasing the earnings of endowment funds. That is its predominant public purpose. The credit clause of Idaho Const. art. 8, s 2, is intended to preclude only State action which principally aims to aid various private schemes. As the parties have noted, the loaning of funds by the State is always presumably of some benefit to the recipient of the funds. However, where such a benefit is merely an incidental consequence of efforts to effectuate a broad public purpose, then it cannot be said to violate the credit clause. . . .
Other cases to the same effect include Continental Illinois National Bankand Trust Company of Chicago v. Illinois State Toll Highway Commission,42 Ill.2d 385, 251 N.E.2d 253 (1969); Industrial Development Authorityv. Eastern Kentucky Regional Planning Commission, 332 S.W.2d 274 (Ken. App. 1960); and Almond v. Day, 197 Va. 782, 91 S.E.2d 660 (1956).[2]
At least one case to the contrary is State ex rel. Saxbe v. Brand,176 Ohio St. 44, 197 N.E.2d 328 (1964). In that case, the Ohio Supreme Court interpreted the constitutional prohibition against the loaning of the state's credit as including the loan of state money. The court recognized that outside Ohio, there were authorities "holding or at least indicating that there can be no prohibited giving or loaning of credit of the state or of one of its subdivisions so long as the one claimed to have given or loaned credit has incurred no indebtedness." Id. at 50. The court rejected this reasoning because other provisions against the incurring of indebtedness were already found in the Ohio Constitution (and in other state constitutions), and as such, a restriction of the "lending of credit" provision to instances in which an indebtedness was incurred would render the provision surplusage.
Most of the cases cited above interpret constitutional provisions prohibiting the lending of the state's credit in "aid of any individual, corporation, association or political subdivision," or similar language. The restriction found in Arkansas' Constitution is broader, stating that the state shall not lend its credit for "any purpose whatever." It has been broadly stated, however, that the purpose of the Arkansas provision is similar to the purpose expressly enunciated in other states and that a loan of credit for a "public purpose" does not violate the constitution.See e.g., Cobb v. Parnell, 163 Ark. 429, 36 S.W.2d 368 (1931).
The Arkansas cases on the question turn upon their own facts. The most relevant cases are Halbert v. Helena, 226 Ark. 620, 29 S.W.2d 802 (1956) and Cobb v. Parnell, 163 Ark. 429, 36 S.W.2d 368 (1931). In Halbert,
several constitutional provisions were at issue, but the court held that the part of an act authorizing the State Board of Finance to purchase bonds from local development corporations did not violate art. 16, § 1. The court stated that:
 The State is certainly not lending its credit to the local development corporation when it purchases bonds and receives the bonds. . . . Whether the State Board of Finance invests the State's surplus in one kind of bond or another is a matter for the Legislature to permit, and for the State Board of Finance to then decide in the exercise of its discretion. Certainly the Legislature can determine what kind of securities can be purchased by the State Board of Finance in its discretion; and until it is shown — and it has not been shown here — that the State Board of Finance has abused its discretion or that such investment impairs the State's ability to pay outstanding obligations as they mature, then no case is made by the appellants under this point."
226 Ark. at 628-629.
The Halbert case is perhaps most in point and while not involving a direct loan of state funds, appears to sanction the investment of such funds under art. 16, § 1 unless the investment "impairs the State's ability to pay outstanding obligations." This reasoning follows that of cases from other jurisdictions, which hold that a true "lending of the state's credit" involves the creation of some new indebtedness on behalf of the state. For the state to be a creditor, rather than a debtor, according to these cases, does not offend the provision. See e.g.,Continental Illinois National Bank and Trust Company of Chicago v.Illinois State Toll Highway Commission, 42 Ill.2d 385, 251 N.E.2d 253
(1969); Industrial Development Authority v. Eastern Kentucky RegionalPlanning Commission, 332 S.W.2d 274 (Ken. App. 1960).
The other most relevant Arkansas case is Cobb v. Parnell, 163 Ark. 429,36 S.W.2d 368 (1931). In Cobb, a much more sweeping case, the legislature created a "State Agricultural Credit Board," the purpose of which was to make loans of state funds to finance corporations, organized and created under the supervision of the State Board, which would then make loans to farmers adversely affected by the drought. The court, in a 4-3 decision, held that the act was not an unlawful "lending" of the State's credit, because it was for a "public purpose." See n. 2, supra.
Two other cases deserve mention, although they involved the art. 16, § 1 prohibition as it applied against cities and counties. They are still of relevance, nonetheless, as the proscription against "lending the credit" applies equally against these entities and the state. In Barnhart v. Cityof Fayetteville, 321 Ark. 197, 900 S.W.2d 539 (1995), the Arkansas Supreme Court struck down, as an impermissible "lending" of the City's credit, the provision of an agreement and ordinance whereby the City guaranteed the debt of a separately organized governmental entity. The guaranteeing of such an obligation constituted a "lending" of the City's credit. The court did not mention any "public purpose" effectuated by the agreement or ordinance.
In another case, Dudley v. Little River County, 305 Ark. 102,805 S.W.2d 645 (1991), the court held that a county's sale of gravel to residents on credit violated the art. 16, § 1 prohibition. The court felt that such action was an unconstitutional "extension" of credit by the county and that this fell within the prohibition against the "lending" of the county's credit. This case did not involve a direct loan of county funds, but did involve an obligation of private citizens to repay the county for services and goods rendered. The court found this impermissible. Any public purpose for the extension of credit to such persons was conspicuously absent.
It appears from a review of the existing case law cited above that the loan of state funds for investment purposes, and for a public purpose, is distinct from a loan of the state's "credit" and does not, as a general matter, run afoul of art. 16, § 1. The Arkansas Supreme Court has not squarely addressed the question you present, however, and the most relevant Arkansas cases were decided decades ago.
Of course as stated previously, the legality or constitutionality of any particular transaction would have to be evaluated under its own facts. I should note additionally, that any number of other constitutional provisions may be applicable to a particular transaction. In this regard, the state may not: 1) become a stockholder in any corporation or association (art 12, § 7); assume or pay the debt of any county, city, town or corporation except as provided in the constitution (art. 12, § 12); issue evidences of indebtedness pledging the faith and credit of the State or any of its revenues for any purpose without the consent of the electors (Amendment 20).
In response to your question therefore, ASHERS, in my opinion, has the authority under current state law to make loans in the investment of its system assets, if the loan is consistent with the applicable state statutes or trust document governing the investment of the funds, and if no provision of the Arkansas Constitution is transgressed. To this extent, ASHERS has the authority to operate a "lending program," under state law.
Senior Assistant Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:ECW/cyh
[1] The term "trustees" as used in this statute, refers to boards of trustees of the five retirement systems covered by the subchapter, including the ASHERS board of trustees. See A.C.A. § 24-3-401 (b)(4) and (c) (Supp. 1999).
[2] More than one dissenting justice in cases such as those cited above, has stated that such rulings "follow a modern trend," but that their "real effect is to justify everything and anything in the name of a "public purpose." Eastern Kentucky Regional Planning Commission,332 S.W.2d 274, 280 (Ken. App. 1960) (Palmore and Bird, J.J. dissenting).