B.S. BROWN and C.G. Watkins, d/b/a B&W Partnership *v.*
Dwight E. BLAKE

CA 03–828                                            161 S.W.3d 298

Court of Appeals of Arkansas
Division IV
Opinion delivered April 28, 2004

*Rieves, Rubens & Mayton*, by: *Kent J. Rubens*, for appellants.

*Crone & Mason, PLC*, by: *Alan G. Crone*, for appellee.

L ARRY D. VAUGHT, Judge. The appeal and cross-appeal in this case question the amount of damages awarded for the conversion of a building, whether that building was a fixture, whether the owners of the building should be allowed to demolish the building, and whether the owners were entitled to an award for their attorney's fees. The trial court found that the building was not a fixture and allowed its removal. The trial court also awarded damages and ruled that each party was responsible for its own attorney's fees and costs. We affirm.

Appellants B.S. Brown and C.G. Watkins formed a partnership, B&W Partnership. The partnership leased land from Burlington Northern Railroad (and its predecessors in title) in Crittenden County and erected a building to house a liquor store on the property. Paragraph fourteen of the lease provided that either party may cancel the lease upon thirty days' notice and that appellants would have thirty days in which to remove any improvements not owned by Burlington and restore the ground to a

condition acceptable to Burlington. In 1997, appellants subleased the building to BBBC Enterprises, LLC, and Robert Blake, individually, for use as a check-cashing store. Robert Blake is the father of appellee Dwight Blake, who was also involved in BBBC Enterprises. At some point, Burlington conveyed the property to ANT, LLC, which later conveyed the property to appellee by deed dated December 28, 1999.

Appellee, through attorney John Morse, on December 31, 1999, sent appellants a letter by certified mail advising appellants that D&E Properties had purchased the property from ANT and had obtained an assignment of the lease. The letter further advised appellants of the termination of the lease in accordance with paragraph fourteen. The letter also stated that, "in the event B&W elects not to remove any of the improvements on the property, our client is willing to hold B&W harmless for its failure to remove such improvements."

On February 3, 2000, appellee filed suit seeking injunctive relief. The complaint alleged appellee's purchase of the land and that notice of the termination of the lease had been given to appellants. The complaint also alleged that, pursuant to paragraph fourteen of the lease, title to the building vested in appellee upon appellants' failure to remove the building within thirty days of notice of termination of the lease. The complaint further alleged that appellants intended to commence demolition of the building and that appellee would suffer irreparable harm if the building was destroyed. An *ex parte* order enjoining appellants from proceeding with the removal or destruction of the building issued the same day and set a hearing for February 9, 2000.

Appellants answered, asserting that the notice of termination of the lease was improper because it was given in the name of D&E Properties and not in the name of the property owner(appellee. Appellants admitted that they planned to destroy the building and asserted that appellee was engaged in a plan to mislead appellants and the trial court as to the true owner of the property so that appellee could obtain the building without paying for it. Appellants also filed a counterclaim seeking both compensatory and punitive damages for appellee's fraudulent misrepresentations.

Following the February 9 hearing, the trial court dissolved the *ex parte* order of February 3, 2000, finding that appellee gave an improper notice of the termination of the lease, that appellee could not show irreparable harm or a likelihood of success on the merits,

and that equity abhors a forfeiture, which would result because appellants were prepared to remove the building but were prevented from doing so by issuance of the restraining order. The trial court reserved the issue of damages for further hearing.

At trial, appellee admitted that paragraph fourteen of the lease provides that appellants shall remove all property or improvements not owned by Burlington within thirty days of termination of the lease and, if not removed, appellants grant Burlington the absolute right to keep, convey, or destroy the property in any manner it chooses. He also admitted that attached to his petition was a·letter from his lawyer, John Morse, in which Morse made a false statement when he asserted that D&E Properties owned the land. Blake stated that the land was never owned by D&E Properties and that, when he signed the verified petition, he had already received a letter from Mr. Brown indicating that Brown did not realize who actually owned the property. Blake admitted that he never talked to Brown to disabuse him of his understanding between Brown's January 17, 2000 letter and February 3, 2000, when appellee filed his petition. Blake stated that there was a sublease between appellants and a check-cashing store controlled by appellee and his father. Appellee stated that his father made an offer that, if appellants were to come into possession of the property, he (Robert Blake) would be willing to pay a reasonable price for the property. However, appellee stated that he did not know whether his father ever told appellants that he would buy the building from them.

Appellee testified that, after ANT purchased the property, he met with appellant Brown to discuss buying the building. Blake stated that Brown showed him a letter that was a part of the correspondence between Brown and ANT concerning purchase of the property. Blake stated that, after his last meeting with Brown, Brown informed him that ANT had requested his (appellee's) name to contact appellee to discuss the purchase further, and that he made contact with ANT immediately through his attorney, Pat Mason, and that Mason arranged the transaction by which Blake purchased the property. Blake admitted that, when he purchased the property, he purchased it subject to the lease between Burlington and appellants.

Blake admitted that he was not aware of any correspondence advising appellants that he, appellee, was the true owner of the property and that the only notice appellants received of the termination was Morse's letter of December 31. Blake also stated

that paragraph fourteen of the lease did not lead him to believe that the building was owned by appellants; it was his position that the building belonged to the land and he would not allow appellants to remove the building.

Blake admitted that he has used the building since February 1, 2000. He also admitted receiving $1,800 per month rent from the check-cashing store under the lease between D&E Properties and the check-cashing store. He stated that he never had the opportunity to inform Brown that he had purchased the property but that there was no particular reason why he did not want to directly tell appellants that he had purchased the property. Blake stated that he did not think it was wrong for Morse to represent to the court that he (appellee) was D&E Properties.

Billy Brown, a member of B&W Partnership, testified that the partnership built a building in 1976 for the purpose of operating a liquor store. He stated that this building was located on the property appellee purchased from ANT. Brown stated that he did not own the real estate when the building was built but that the partnership held leases with the railroad. Brown testified that they ultimately leased the building to an entity in which the Blakes had an interest. Brown testified that the construction of the building was paid for by the partnership and that the building had been fully depreciated.

He admitted to having approximately six conversations with appellee about buying the property. He stated that ANT contacted him, advising that they had purchased the property from the railroad and wanting to know if he would be interested in buying it, that he communicated this to appellee and, when he told appellee that he wanted to buy the property, appellee stated that he also was interested in purchasing it. Brown admitted that appellee did not impede his efforts to purchase the property from ANT. He stated that he could not purchase it from ANT simply because he and ANT could not agree on a price. He stated that it was only after negotiations had broken down with ANT that he told appellee about ANT's ownership of the property and its desire to sell the property to somebody. Brown admitted not having paid rent to appellee for the last three years under the original lease. He admitted that he was not able to negotiate the purchase of the property from ANT and advised appellee that he had been unsuccessful. He stated that he suggested to appellee that it might be better if he (appellee) negotiated for the purchase himself. Brown also stated that he made it known to appellee that, if appellee

purchased the property and he could not sell the building to appellee, he was going to tear the building down.

He stated that his options were to either purchase the property for $32,500 or sell the building to appellee who could then consider purchasing the real estate. Brown testified that, prior to service of the injunction, he was unaware that appellee owned the property because he believed that D&E Properties owned the property and did not have any reason to believe that appellee was D&E Properties. He admitted that, after the temporary order was rescinded, he attempted to demolish the building but was prevented from doing so. He also stated that he never agreed that appellee could use the property after February 2000. Brown stated his opinion that the fair market value of the rental property was $1,000 per month and that appellee and the other entities had it rent free for three years. He stated that he did not want appellee to keep the building if the court ruled that it was his building. He stated that he would like to receive the fair market rental value for the property plus the insurance and other payments he has had to make. Brown stated that he never received money back from appellee for the prepaid rent that he had paid to ANT under the lease assigned to ANT by the railroad. Brown stated that the building cost approximately $40,000 to build in 1976. He admitted that it was a permanent building, constructed with concrete cinder blocks. He also admitted that the only way to remove the building is to demolish it. He stated that it is not a portable or modular building. He admitted that the requirement to tear down the building was the railroad's requirement and that it was not something that he had specific negotiations about.

In its judgment, the trial court found that appellee and his attorney, John Morse, misrepresented the true owner of the property to appellants and did not give proper notice of termination of the lease until the *ex parte* order and complaint were served upon appellants. The trial court awarded compensatory damages of $790 for an additional month's rent, $195.82 in property taxes, and $785 for insurance premiums, for a total of $1,770.82. The trial court also found that appellee tried to acquire the building by deceit after being unsuccessful in buying the building. The trial court also noted that appellee had acquired the land and had occupied the building for two years without paying rent. The trial court awarded appellants punitive damages in the sum of $10,000. The trial court, noting that parties are free to contract as they will and that it is the court's duty to enforce contracts as written,

rejected appellee's argument that the building was a fixture. The court then concluded that appellants had the right under the contract to remove the building and allowed appellee ninety days to vacate the building. Appellants were then given thirty days after appellee vacated the building to tear down the building. This appeal and cross-appeal followed.

Appellants raise two points on appeal: first, that the trial court's award of compensatory and punitive damages was insufficient as a matter of law and, second, that the trial court erred in failing to award an attorney's fee. Appellee also raises two points on cross-appeal: that the trial court erred in allowing appellants to take possession and demolish the building because it had become a fixture to the realty, and that there was insufficient evidence upon which to support an award of compensatory or punitive damages.

When a case is tried by a circuit court sitting without a jury, our inquiry on appeal is whether the trial court's findings are clearly erroneous, or clearly against the preponderance of the evidence. *Buck v. Gillham*, 80 Ark. App. 375, 96 S.W.3d 750 (2003). Recognition must be given to the trial judge's superior opportunity to determine the credibility of the witnesses and the weight to be given to their testimony. *Gosnell v. Independent Serv. Fin., Inc.*, 28 Ark. App. 334, 774 S.W.2d 430 (1989).

We will discuss the points out of order in what we believe to be a more logical manner. Appellee, arguing that the building became a fixture, first challenges the trial court's finding that appellants would be allowed to demolish the building. According to appellee, the building is a fixture because it was attached to the realty and could be removed only by destroying the building. The trial court found that, because the parties can contract in any manner in which they choose, appellants should be allowed to remove the building. Although it is true that there are cases, cited by appellee, in which similar installations were found to have been fixtures, rather than personalty, *see e.g., Corning Bank v. Bank of Rector*, 265 Ark. 68, 576 S.W.2d 949 (1979); *Dobbins v. Lacefield*, 35 Ark. App. 24, 811 S.W.2d 334 (1991); *Barron v. Barron*, 1 Ark. App. 323, 615 S.W.2d 394 (1981), it does not follow that the building is a fixture as a matter of law. The question of whether particular property constitutes a fixture is usually a mixed question of law and fact. *Corning Bank, supra*. In determining whether items are chattels or fixtures, it is necessary to consider: (1) whether the items are annexed to the realty; (2) whether the items are appro-

priate and adapted to the use or purpose of that part of the realty to which the items are connected; and (3) whether the party making the annexation intended to make it permanent. *McIlroy Bank & Trust v. Federal Land Bank*, 266 Ark. 481, 585 S.W.2d 947 (1979); *Adamson v. Sims,* 85 Ark. App. 278, 151 S.W.3d 23 (2004); *Garmon v. Mitchell*, 53 Ark. App. 10, 918 S.W.2d 201 (1996). Appellee's argument focuses on the permanent nature of the building and not on appellants' intent, as evidenced by the lease, when erecting the building. The supreme court has indicated that the intentions of the party making the annexation is the most important test. *Pledger v. Halvorson*, 324 Ark. 302, 921 S.W.2d 576 (1996); *Kearbey v. Douglas*, 215 Ark. 523, 221 S.W.2d 426 (1949).

█ In the case at bar, it is clear that neither appellants nor Burlington intended for the annexation to be permanent because the lease agreement expressly provided that the appellants should have the right to build on the property and, within thirty days of termination of the lease, "shall remove all property or improvements not owned by Burlington." Appellee tries to distinguish *Garmon* by arguing that the lease in that case provided that the lessee shall have the *right* to remove the building while, in the present case, appellants had the *obligation* to remove the building. However, this is a distinction without a difference because rights and obligations are two sides of the same coin: if appellants exercise their right to erect a building on the land, then their obligation arises to remove the same building on termination of the lease. Given this clear expression of the intent of the party making the annexation to treat the building as a chattel, this court cannot say that the trial court clearly erred in holding that it was not a fixture. *See Garmon, supra.*

We affirm on this point.

Both parties challenge the trial court's award of damages, appellants arguing that the award was insufficient and appellee arguing that there was insufficient evidence on which to base an award of damages.

█ Conversion is a common-law tort action for wrongful possession or disposition of another's property. *McQuillan v. Mercedes-Benz Credit Corp.*, 331 Ark. 242, 961 S.W.2d 729 (1998). In order to establish liability for conversion, a plaintiff must prove that the defendant wrongfully committed a distinct act of dominion over the property of another, which is a denial of or is

inconsistent with the owner's rights. *Id.* Where the defendant exercises control over the goods in exclusion or defiance of the owner's rights, it is a conversion, whether it is for defendant's own use or another's use. *Id.* Conscious wrongdoing is not the requisite intent for conversion; rather what is required is that a person has the intent to exercise control or dominion over the goods. *Id.* To be sufficient, the complaint must state that the plaintiff had a property interest in the subject goods and that the defendant wrongfully converted them. *Big A Warehouse Distribs. v. Rye Auto Supply*, 19 Ark. App. 286, 719 S.W.2d 716 (1986). The property interest may be shown by a possession or a present right to possession when a defendant cannot show a better right. *Id.* Ordinarily, the proper measure of damages for conversion of property is the market value of the property at the time and place of its conversion. *Elliott v. Hurst*, 307 Ark. 134, 817 S.W.2d 877 (1991); *Ford Motor Credit Co. v. Herring*, 267 Ark. 201, 589 S.W.2d 584 (1979).

■ Appellee argues that there was not sufficient evidence to justify an award of either compensatory or punitive damages. It was undisputed that appellee failed to give proper notice of termination of the lease to appellants. It is also undisputed that appellants were not allowed to regain possession of the building by appellee's having obtained the *ex parte* restraining order and have not been able to exercise control of the building since that time. Appellee, on the other hand, has been in possession of the building without appellants' permission for some three years. As such, this was a conversion of appellants' building, making appellee liable to pay damages. *McQuillan, supra. See also Hofreiter v. Schwabland*, 72 Wash. 314, 130 Pac. 364 (1913),where the converted property was a house.

■ Appellants argue that the amount of damages was insufficient and that the trial court should have awarded them the fair market value of the building, which they assert was $40,000, or the rental value of the property of $1,800 per month. However, the market value of the property is not the only measure of the damages recoverable in an action for conversion; the circumstances of the case may require a different standard, including a measure of the expenses incurred as a result of the conversion. *First Nat'l Bank of Brinkley v. Frey*, 282 Ark. 339, 668 S.W.2d 533 (1984). In *Frey*, the bank refused to pay a certificate of deposit and

was held liable for conversion of $491.74 in interest the certificate owners would have received, together with $35,000 in punitive damages. The $491.74 amount was actual damages suffered by the certificate owners because of the bank's failure to pay the certificate plus interest. Alternatively, in *Holland v. Walls*, 3 Ark. App. 20, 621 S.W.2d 496 (1981), we held that the seller of an abstract company exercised dominion over, and thereby converted, a duplicate copy of the tract books she had sold to the appellant. This court reversed the trial court and remanded for an award of damages based on the seller's unjust enrichment through the use of the copies of the tract books.

We believe that the trial court was using the actual damages measure found in *Frey, supra*, when it awarded appellants damages of $790 for an additional month's rent, $195 in property taxes, and $785 in insurance premiums. Because the lease allowed for the termination of appellants' tenancy upon thirty days' notice, we cannot say that this award is clearly erroneous, even though the court could have used a different measure of damages in the first instance, such as the amount by which appellee was unjustly enriched. *See Holland, supra.*

Both parties also take issue with the award of punitive damages. Punitive damages are a penalty for conduct that is malicious or done with the deliberate intent to injure another. *Routh Wrecker Serv., Inc. v. Washington*, 335 Ark. 232, 980 S.W.2d 240 (1998). Malice does not necessarily mean hatred; it is rather an intent or disposition to do a wrongful act greatly injurious to another. *See Fuqua v. Flowers*, 341 Ark. 901, 20 S.W.3d 388 (2000). The fraud found by the trial judge in this case is the type that was intended to cause injury to another. The judge found that appellee and his attorney misrepresented the true ownership of the land to appellants in order to obtain a building without paying for it. *See Firstbank of Ark. v. Keeling*, 312 Ark. 441, 850 S.W.2d 310 (1993) (holding that where there is substantial evidence of deliberate misrepresentation, fraud, or deceit, the issue of punitive damages may be submitted to the fact-finder). Here, appellee admitted that Morse's letter to appellants contained a false statement that D& E owned the land. Further, this same misrepresentation was repeated when appellee obtained the *ex parte* order preventing appellants from removing the building. Thus there is a proper foundation for an award of punitive damages. The supreme court has also refused

to set a particular formula for measuring punitive damages; rather, the calculation of those damages lies within the discretion of the fact-finder after due consideration of all the attendant circumstances. *Smith v. Hansen*, 323 Ark. 188, 914 S.W.2d 285 (1996). We cannot say that the amount of the punitive damages award is an abuse of the trial court's discretion. It is, at 5.647 times the award of compensatory damages, within the single-digit rule. *See Advocat, Inc. v. Sauer*, 353 Ark. 29, 111 S.W.3d 346 (2003). We affirm on this point.

██ ██ Appellants argue that they should have been awarded attorney's fees, either as part of their damages in a conversion action or pursuant to statute, Ark. Code Ann. § 16-22-308. The general rule in Arkansas is that attorney's fees are not awarded unless expressly provided for by statute or rule. *Security Pac. Housing Servs., Inc. v. Friddle*, 315 Ark. 178, 866 S.W.2d 375 (1993). Arkansas Code Annotated section 16-22-308 provides for a reasonable attorney's fee in certain civil actions, including actions to recover for breach of contract. This statute does not, however, provide for the recovery of attorney's fees in tort actions. *Reed v. Smith Steel, Inc.*, 77 Ark. App. 110, 78 S.W.3d 118 (2002). The prevailing party in a conversion action is not entitled to an award of attorney's fees. *Mercedes-Benz Credit Corp. v. Morgan*, 312 Ark. 225, 850 S.W.2d 297 (1993).

In *McQuillan, supra*, the Arkansas Supreme Court drew a distinction between legal fees incurred in attempting to recover property and those incurred in litigating a conversion claim. It held that the secured party was not entitled to an award of attorney's fees for its expenses incurred in litigating conversion and replevin claims, as opposed to the costs incurred in the recovery of the property itself. Here, the trial court *could* have awarded appellants their fees in attempting to recover possession of the building. Further, the trial court could have also awarded fees under section 16-22-308 because the case involved the interpretation of a written contract, the lease between appellants and Burlington, and the breach of that agreement.

██ A trial court is not required to award attorney's fees and, because of the trial judge's intimate acquaintance with the trial proceedings and the quality of service rendered by the prevailing party's counsel, appellate courts usually recognize the superior perspective of the trial judge in determining whether to award attorney's fees. *Jones v. Abraham*, 341 Ark. 66, 15 S.W.3d

310 (2000); *Chrisco v. Sun Indus. Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990). The decision to award attorney's fees and the amount to award are discretionary determinations that will be reversed only if the appellant can demonstrate that the trial court abused its discretion. *Nelson v. River Valley Bank & Trust*, 334 Ark. 172, 971 S.W.2d 777 (1998); *Burns v. Burns*, 312 Ark. 61, 847 S.W.2d 23 (1993). A grant of attorney's fees is an issue within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Chrisco, supra.* Appellants have not shown that the trial court abused its discretion.

Affirmed on direct appeal; affirmed on cross-appeal.

HART and BAKER, JJ., agree.