HOT SPRING COUNTY SOLID WASTE AUTHORITY *v.*
HOT SPRING COUNTY, Raymond Yerby,
and Harold Thornton

CA 06-38                                          240 S.W.3d 144

Court of Appeals of Arkansas
Opinion delivered September 27, 2006

[Rehearing denied November 1, 2006.]

*Wilson, Engstrom, Corum & Coulter,* by: *Gary D. Corum,* and *Shirley E. Jones,* for appellant.

*Ralph C. Ohm,* for appellees.

OLLY NEAL, Judge. The issue in this case is which of two governmental entities has the right to certain tax revenues. In 1991, Hot Spring County voters approved a one percent sales and use tax, to be used primarily to fund the operation of the

appellant, Hot Spring County Solid Waste Authority (the SWA). By 2003, the total income generated by the tax exceeded SWA expenditures by $3,440,339.23, and, in 2004, the appellee, Hot Spring County, transferred that amount, plus an additional $59,660.77 (for a total of $3.5 million), to its "Future Jail Construction Fund." The SWA asked the circuit judge to order the money returned to it. Following a hearing, the judge ruled that the County was entitled to the money, although he required the County to reimburse the SWA $59,660.77. The SWA now brings this appeal. We affirm.[1]

The County established the SWA by ordinance in 1985, pursuant to the Joint County and Municipal Solid Waste Disposal Act. *See* Act 699 of 1979. The Act permits municipalities and counties to create and become members of a sanitation authority, *see* Ark. Code Ann. § 14-233-104 (Supp. 2005), and recognizes the sanitation authority as "a public body and body corporate and politic." *See* Ark. Code Ann. §§ 14-233-102(12), -105(c)(3) (Supp. 2005). Our supreme court has described an authority created pursuant to the Act as a "separate governmental entity." *See Barnhart v. City of Fayetteville*, 321 Ark. 197, 204, 900 S.W.2d 539, 542 (1995).

In the early years of the SWA's operation, it was funded by a flat user fee assessed to each household, to be collected annually with personal-property tax. However, in December 1990, the County repealed the user fee and called for an election to levy a one-percent county-wide sales-and-use tax. The Ordinance, using the following pertinent language, established the manner in which the tax proceeds would be used:

> Section 2. The Quorum Court of Hot Spring County, Arkansas hereby calls for an election for the levy of a one percent (1%) county-wide sales and use tax to be in effect for a period beginning February 1, 1991, and the revenues derived from the sales and use tax shall be used as hereinafter provided.
>
> a. The entire per capita share of Hot Spring County's sales and use tax shall be deposited into the Hot Spring County General Fund as

---

[1] The other named appellees are Raymond Yerby and Harold Thornton, citizens of Hot Spring County and members of the County quorum court. For convenience, we will refer to all appellees as the County.

the same may be received from the State Treasurer and thereafter appropriated by the Quorum Court for the following designated purposes:

> (i) 95% shall be appropriated annually to pay the existing indebtedness of SWA to FmHA and Bank of Malvern, Malvern, Arkansas, and the annual operation and maintenance of SWA and upon the retirement of the debt to FmHA and Bank of Malvern, Malvern, Arkansas, these revenues may be appropriated by the Quorum Court:

> (A) FIRST: To fund the annual operation and maintenance of SWA, and;

> (B) SECOND: To fund other general needs of the County as authorized by law.

> (ii) 5% shall be appropriated into a reserve fund to be used for the purchase, acquisition and/or construction of landfills and recycling facilities, all for the purpose of solid waste disposal and/or recycling.

The voters approved the levy in 1991, and collection of the tax began. The SWA's debts to FmHA and the Bank of Malvern were satisfied in 1993.

Beginning in 1994, the sales-tax proceeds, which were placed in the SWA Fund 3500 in the county treasurer's office, were made available to the SWA for annual operation and maintenance. On a yearly basis, the SWA would prepare a budget for the County quorum court, and the court would generally make an appropriation. The SWA would then submit claims for the money as needed (although in more recent years the County simply transferred a set amount each month to the SWA). Between 1994 and 2003, the SWA's expenditures from the 3500 Fund were, as a rule, considerably less than the amount of tax proceeds available. As a result, unspent money began to accumulate, and by December 2003, that amount totaled $3,440,339.23.

In 2003 and 2004, budgetary disputes arose between the SWA and the County, and the SWA began to realize that the County had its eye on the unspent tax revenues. In order to stake its own claim to those revenues, it submitted 2004 and 2005 budget requests of approximately $4.2 million and $3 million,

respectively, which considerably exceeded 2003's request of about $1.5 million. The County declined to appropriate those amounts. Then, on November 15, 2004, the County, by Ordinance 04-37, established a "Future Jail Construction Fund" to be funded with $3.5 million appropriated from the unspent tax revenues.

In response, the SWA moved for a temporary restraining order enjoining the transfer of the funds.[2] Its primary contentions were that the SWA, as an independent body politic, was in charge of its own budget and the County had no power to modify or reject the budget; that the County could use the tax revenues for its own purposes only if there were "excess" funds available; and that the $3.5 million taken by the County was not excess money but the result of 1) prudent long-term management by the SWA, and 2) the County's refusal to appropriate the full amount of SWA's 2004 and 2005 budget requests. The County, on the other hand, claimed that the SWA had been able to operate within its budget and accumulate a sizeable excess, which, under the terms of the tax ordinance, could be used for other County needs, such as a new jail.

Following a hearing on September 25, 2005, the trial judge entered an order containing numerous findings of fact and conclusions of law. Many of the findings and conclusions favored the SWA, for example, that the SWA was a separate governmental entity; that the County had no authority to supervise the SWA operations or exercise any hold over the SWA's "budgetary purse strings"; that the County's appropriation of funds to the SWA from the tax revenues was a purely ministerial act; that the County quorum court had no authority to reject or modify the SWA's budget; and that funds collected for 2004 and 2005 were to be "rebudgeted."[3] However, as pertinent for our purposes, the court ruled that: 1) the structure of the sales tax approved by voters envisioned the possibility that the sales tax could generate more funds than were necessary to fund the SWA; 2) only in such event would there be "excess funds" to be used for non-SWA purposes; 3) at the end of 2003, there was a "surplus of money" that had

---

[2] The County had actually filed suit in October 2003, seeking a declaratory judgment regarding its ability to use the tax revenues. The trial judge declined to make a complete ruling on the issue since the County had not, at that time, tried to use any of the revenues. The SWA's motion for a restraining order was simply a continuation of that action.

[3] These conclusions were not appealed by the County and will not be addressed further except as they relate to points raised by the SWA.

accumulated since 1994 in the amount of $3,440,339.23; 4) no one had used these "excess funds" for ten years, and it was obvious that the money was not needed by the SWA; 5) the County was entitled to transfer the $3,440,339.23 to the Jail Fund; 6) because the County had transferred $3.5 million, it must reimburse the SWA $59,660.77.

Following entry of the trial court's order, the SWA filed a timely posttrial motion to amend the findings or for a new trial, which was denied. This appeal followed.

Our standard of review from a bench trial is well established. When a case is tried by a circuit court sitting without a jury, the inquiry on appeal is whether the trial court's findings are clearly erroneous, or clearly against the preponderance of the evidence. *Brown v. Blake*, 86 Ark. App. 107, 161 S.W.3d 298 (2004). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with the firm conviction that a mistake has been committed. *Cole v. Cole*, 89 Ark. App. 134, 201 S.W.3d 21 (2005).

The SWA argues first that the trial court's use of December 31, 2003, as the date for determining the amount of excess funds was clearly erroneous. The trial court used the 2003 date despite the fact that the County made the actual transfer of revenue in December 2004 — a time by which, according to the SWA, it had established its entitlement to the money through the 2004 and 2005 budget requests.

We see no clear error in the court's use of the 2003 date. From 1994 to 2003, unspent tax money accumulated without regard to whom it belonged. Controversy began to simmer in the latter part of 2003, when the County made a budget cut and the SWA requested $4.2 million for the upcoming 2004 budget year. The trial court may therefore have concluded that the 2003 year-end represented the last, most accurate accounting of the unspent tax revenue prior to the controversy being joined in earnest the following year. Moreover, the trial court required the 2004 and 2005 SWA funds to be re-budgeted, and therefore, by its use of the December 2003 date, created a new starting point for the parties beginning in 2004. Thus, the court's use of the December 2003 date is logical in light of its ruling as a whole, and certainly cannot be considered arbitrary, as the SWA suggests.

Next, the SWA contends that the trial court clearly erred in characterizing the unspent revenues as "excess." This contention

is based on the SWA's claims that, over the years, the County treated those revenues as belonging to the SWA; that the County could not unilaterally take such revenues without first making a determination that the revenues were "excess" in nature; and that such revenues could not be denied once the SWA expressed a need for them. unless the request was arbitrary, which has not been shown here. We find no merit in any of these points.

The language of the County's levying ordinance in the case at bar states that, once the SWA's debts are paid and five percent is set aside for a reserve fund, the object of the tax is: "(A) FIRST: To fund the annual operation and maintenance of SWA, and; (B) SECOND: To fund other general needs of the County as authorized by law." The ballot title from which the voters approved the tax, stated that the tax was "for the benefit of SWA, Hot Spring County and the several municipalities therein . . . ." Words in an ordinance are generally given their natural and obvious import and their ordinary and commonly accepted meaning. *See Thompson v. Younts*, 282 Ark. 524, 669 S.W.2d 471 (1984). Moreover, electors have a right to look to the ordinance and ballot title to ascertain what they are being asked to approve, and the ballot title is the final word of information and warning to which the electors have the right to look as to what authority they are being asked to confer. *See Daniel v. Jones*, 332 Ark. 489, 966 S.W.2d 226 (1998).

With these precepts in mind, we observe, as the trial court did, that the ordinance and the ballot title clearly contemplated that the tax might raise revenues over and above what was needed for the SWA's annual operation and maintenance. Moreover, the ordinance established a priority for such an eventuality, that is, that the money would go "first" to the SWA and "second" to the County's other needs. Common sense, then, would dictate that tax revenues not spent on the SWA's annual operation and maintenance could be used by the County. Nowhere do we find a requirement, as urged by the SWA, that, before the County could receive the tax proceeds at issue here, an express determination must have been made that excess funds existed; nor do we believe that the arbitrariness or lack thereof of the SWA's purported need for the tax revenues has any bearing on the trial court's award of the particular funds at issue here. Further, even if we agreed with the SWA that the County historically regarded the unspent funds as belonging to the SWA, we do not agree that such actions can serve to alter the manner in which the voters intended to spend the

tax proceeds. Instead, we simply express our accord with what we believe is the essence of the trial court's ruling: that, under the taxation scheme in the present case, the revenues that accumulated over the years were not spent on the tax's "first" object, the SWA's annual operation, and were therefore available to be spent on the "second" object, the County's general needs. We thus conclude that the trial court's declaration that the $3,440,339.23 was available for the County's use is not clearly erroneous.

Finally, as an alternative argument, the SWA avers that the trial court should have awarded it a reimbursement of $520,000 rather than $59,660.77. This argument is based on the fact that, in 2003, the SWA had been appropriated approximately $1.56 million dollars. In August 2003, by which point the County had transferred to the SWA approximately $1.04 million, the County stopped transferring money for the remainder of the year. Thus, $520,000 of appropriated money was never transferred to the SWA, and, according to the SWA, that resulted in the 2003 year-end excess fund being artificially inflated by that amount.

■ As the trial court observed, there was evidence that the County's decision to stop transferring money to the SWA came about not of the County's own accord but at the behest of the Bureau of Legislative Audit. According to witnesses, Legislative Audit required this action because the SWA had accumulated a large amount of funds in its own operating account. Thus, the trial court may well have reasoned that the budget cut was not the result of the County exercising improper authority over the SWA's budget but rather an auditor determining that the SWA should operate with the money it had on hand. Under these circumstances, we do not agree that the figure of $3,440,339.23 was artificially inflated — it represented money that, as of December 31, 2003, had not been spent on the annual operation and maintenance of the SWA.

In light of the foregoing, we affirm the trial court's order.

Affirmed.

PITTMAN, C.J., and BIRD, J., agree.