# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3602

_____

|  |  |  |
|---|---|---|
| Christopher C. McGrann, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| First Albany Corporation, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 21, 2005
Filed: September 14, 2005

_____

Before RILEY, BOWMAN, and BENTON, Circuit Judges.

_____

RILEY, Circuit Judge.

Christopher C. McGrann (McGrann) filed suit to enforce an arbitration award in his favor in the amount of $840,165.99 against his former employer, First Albany Corporation (FAC). FAC moved to vacate the arbitration award partially to $340,165.99. The district court[1] confirmed the entire arbitration award, and entered judgment in McGrann's favor. We affirm.

_____

[1]The Honorable James M. Rosenbaum, Chief Judge, United States District Court for the District of Minnesota.

## I. BACKGROUND

From 1995 to 2001, McGrann worked as a research analyst and institutional salesperson for the investment bank of Wessels, Arnold and Henderson (Wessels)[2] in Minneapolis, Minnesota. During his tenure at Wessels, McGrann's sales territory included Boston and New York. In 1999, McGrann earned $1,075,000; in 2000, he earned $1,400,000.08. In his 1999 year-end performance review, McGrann was characterized as professional, trusted, intelligent, and one of Wessels's top salespersons.

In the fall of 2000, FAC's Senior Vice President and Director of Institutional Equity Sales contacted McGrann and two other salespersons at Wessels to discuss employment with FAC. During negotiations, McGrann estimated the revenues he might generate if he joined FAC's institutional equity sales division. In March 2001, FAC offered employment to McGrann and the other two Wessels employees. In an agreement dated March 30, 2001, FAC hired McGrann as Managing Director of FAC's Institutional Equity Sales Department under the following terms:

> We have agreed to pay you a base salary at the rate of $150,000 per year for calendar years 2001 and 2002 to the extent you remain employed by us. Generally, bonuses are based on your contribution, the performance of the firm as a whole and other important factors within our sole discretion. However, we have agreed to pay you a bonus of not less than $500,000 for 2001 and $600,000 for 2002. Such bonuses will be payable on February 15th of the following year or on such other date as firm-wide bonuses are paid, and only if you remain employed by us at such times.
>
> . . . .

---

[2]Wessels was later acquired by Dain Rauscher, which was then acquired by Royal Bank of Canada. For convenience, we refer to McGrann's employer as Wessels.

We have agreed to give you a loan of $350,000 (the "Loan") [, which] . . . will be forgiven in two equal annual installments during the Employment Period provided that you remain employed by us on such dates.

We will also recommend to the Board [of Directors of FAC] that you be granted such number of shares of restricted stock of the firm (the "Restricted Stock") valued at $500,000 . . . . The Restricted Stock shall be subject to vesting over the first three years of your employment, one-third per year.

We will also make a contribution (the "Contribution") on your behalf to [FAC's] Deferred Compensation Plan for Key Employees and in accordance with the terms thereof in the amount of $500,000. Such contribution shall be subject to vesting over the first three years of your employment, one-third per year.

You will also be entitled to participate in the standard employee benefit plans . . . .

If [FAC] terminates your employment for any reason other than Cause (as defined below) prior to the second anniversary of your employment you will (i) receive the balance of your unpaid base salary and shall be vested in the Restricted Stock and the Contribution, in each case as though you had been employed for two full years, (ii) be forgiven the Loan in full and (iii) receive (or have already received) the bonus for the year 2001. . . .

. . . .

This letter agreement shall be subject to, governed by and construed in accordance with the laws of the State of New York without regard to its choice of law principles . . . .

In November 2001, FAC tried to renegotiate the terms of the agreement, asking McGrann "to rip up" his compensation guarantees. McGrann responded, "We all

negotiated in good faith and all of a sudden [FAC] want[s] us to give these up six months later? No. We're not interested in that." Within a week, FAC terminated the employment of one of the three Wessels employees who had moved to FAC. The day after that termination, FAC summoned McGrann to a meeting, informing him his "account package is under review." At the meeting, FAC changed McGrann's coverage territory. McGrann responded he was willing to make the change if he could help the firm. FAC then sought concessions on McGrann's guaranteed compensation, saying, "You should do the honorable thing and offer to make concessions to FAC." McGrann responded, "We all negotiated in good faith." FAC replied, "Honorable men make honorable gestures." Although McGrann refused to concede his compensation guarantees, FAC nonetheless reassured McGrann that FAC wished to retain him.

On April 30, 2002, FAC again approached McGrann about his compensation, informing McGrann that FAC was "coming after" his contractual guarantees. FAC asked McGrann, "Will you tear up your guarantee [on your cash bonus]. . . . if you tear that up, you can keep the restricted stock and deferred comp, but just give back the $600,000." The next day, FAC bluntly said to McGrann, "We want to honor [your employment] contract but your production has sucked."[3] To the point, FAC said, "If you don't give up your guarantees, [FAC] can't control what might happen." In response to FAC's request to renegotiate, McGrann stated, "At this point I am not willing to cut up my contract. I took a ton of risk coming here." FAC answered, "OK. That's your–that's your choice, but now it's all about business. It's not personal."

On May 13, 2002, FAC sent McGrann a letter stating he had "not substantially performed [his] duties" and his "production ha[d] been extremely disappointing."

---

[3]Despite FAC's contention, McGrann was ranked fourth out of nineteen salespersons at the time.

The letter threatened a for cause termination of employment if McGrann did not cure all of his performance deficiencies, which could only be accomplished if McGrann generated $400,000 of revenue per month for three months. FAC's top producer had achieved only $300,000 of revenue in any given month. Despite the tall order, McGrann increased the intensity of his work to meet FAC's new demands.

On October 18, 2002, FAC terminated McGrann's employment, contending the termination was for cause because McGrann failed to perform his duties. FAC simply determined "it was worth the risk to fire [McGrann] for cause." When seeking employment after the termination, McGrann informed potential employers FAC terminated his employment for cause due to his inability to meet production requirements. McGrann believes his duty to inform potential employers of his for cause termination caused him to lose "leverage" in the employment process, as he "was not able to negotiate . . . from a position of strength."

Because the parties were associated with the National Association of Securities Dealers, Inc. (NASD), McGrann sought arbitration before an NASD Dispute Resolution panel. Over the course of eleven days, McGrann and FAC presented their claims to an arbitration panel. The panel's arbitration award provided the following case summary:

> [McGrann] asserted the following causes of action [against FAC]: breach of contract, violation of Minnesota Stat. § 181.64, and violations of NASD rules. The causes of action related to [McGrann]'s allegation that FAC breached its employment contract with him after unilaterally imposing additional performance obligations. [McGrann] further alleged that FAC stated false and defamatory reasons for his departure and has not honored the guaranteed bonuses and incentives as set forth in the March 30, 2001 employment contract.

McGrann initially sought unspecified damages. At the hearing, McGrann sought $840,165.99 in compensatory damages, as well as costs, attorney fees, interest, punitive damages and equitable relief. McGrann's attorney presented the following argument to the panel: "[FAC] breached the contract. They don't get the benefit of a contract that they didn't adhere to. Mr. McGrann worked 5/6ths of the year. At a minimum he is entitled to 5/6ths of his bonus. And we believe, but for this breach, he would have finished the year and earned his entire $600,000."

FAC denied McGrann's allegations, asserted a number of affirmative defenses, and counterclaimed for breach of contract, fraud, misrepresentation, fraudulent inducement, negligence, negligent misrepresentation and violation of NASD rules. At the hearing, FAC sought $350,000 in compensatory damages, as well as interest, attorney fees, punitive damages, costs and equitable relief. FAC presented the arbitration panel an exhibit outlining FAC's theory regarding "the alternate 'for cause' and 'no cause' termination pay-out scenarios as of October 18, 2002, the termination date." According to FAC, if the arbitration panel found FAC terminated McGrann's employment for cause, then McGrann owed FAC $175,000 plus interest. On the other hand, FAC contended, if the arbitration panel found FAC terminated McGrann's employment without cause, then the maximum FAC owed McGrann was $340,165.99. According to FAC, the agreement limited McGrann's damages for termination without cause to $340,165.99, which included $66,875 in unpaid salary; $136,673.99 in restricted stock; and $136,617 in deferred compensation.

On March 2, 2004, the arbitration panel issued its award. The arbitration panel found in McGrann's favor, and awarded him $840,165.99 in compensatory damages, interest on that amount, $100,000 in attorney fees under Minnesota Statutes section 181.13, and $250 for filing fees. The arbitration panel also found no evidence supported FAC's fraud claim, and that claim "was made only for the purpose of coercing" McGrann.

-6-

Seeking confirmation of the arbitration award, McGrann filed suit in Minnesota state court, and FAC removed the case to federal court. FAC moved to vacate, in part, the award based on the no cause termination provision. Claiming the arbitration panel failed to follow the parties' agreement, manifestly disregarded the law, and acted irrationally in delivering its award, FAC asked the district court to reduce the award to $340,165.99.

The district court confirmed the arbitration award, finding "there is no evidence to support the claim that the arbitrators disregarded the law. . . . [T]he defendant also fail[ed] to illustrate irrationality in the award such that this Court should disregard its conclusions." Rejecting FAC's argument the agreement limited the damages the arbitration panel could award, the district court concluded:

> [T]here's no evidence to support [FAC's] argument that the arbitrators were restricted simply to that [agreement] in returning their awarded damages. The panel is not bound by FAC's own self-serving interpretation of its letter agreement. The agreement makes no provision for any contractual damages. . . . [T]here was evidence from which [the arbitration panel] could have found that [FAC] did breach the letter agreement when they fired [McGrann] and falsely styled it as for cause. In that case [the arbitration panel] could have awarded damages resulting simply from the breach alone.

Citing United Industrial Syndicate, Inc. v. Western Auto Supply Co., 686 F.2d 1312, 1316 (8th Cir. 1982), the district court noted the arbitration award could have been based on the general proposition "that breach of [contract] damages are measured by placing the nonbreaching party in the position it would have been but for that breach."[4] However, the district court quickly recognized, "It's not for this Court to

---

[4]Although the district court cited an Eighth Circuit case for this general statement of breach of contract remedies, New York law adheres to this same principle. See Siegel v. Laric Entm't Corp., 763 N.Y.S.2d 607, 608 (N.Y. App. Div.

conjecture on the basis which the arbitral panel reached." Finally, the district court noted:

> [McGrann] also produced evidence that his termination did cause damages beyond his lost compensation, and that might have included damages for defamation . . . . The arbitrators may have considered [McGrann's] difficulty in securing new employment in their award. Having then a number of possible bases, this Court cannot find that the determination by the arbitral panel was either in disregard of the law or irrational.

FAC appeals the district court's confirmation of the entire arbitration award. FAC contends the arbitration panel "exceeded their powers and foisted their interpretation upon an unambiguous contract provision," and also "crafted an irrational award that failed to draw its essence from the plain language of the parties' Agreement." In essence, FAC argues its interpretation of the agreement's compensation guarantees, when analyzed under either the for cause or no cause termination provisions, is the only reasonable interpretation of what FAC deems to be an unambiguous agreement. Because the arbitration panel–and later the district court–did not agree with FAC's interpretation, FAC contends we must reverse the district court, vacate the arbitration award, and remand with instructions to confirm the arbitration award only in the amount of $340,165.99.

## II.    DISCUSSION
### A.    Standard of Review

When reviewing a district court's order confirming an arbitration award, we review de novo questions of law, but we accept the district court's factual findings unless clearly erroneous. Schoch v. InfoUSA, Inc., 341 F.3d 785, 788 (8th Cir.

2003) ("It is well established that [breach of contract] damages are intended to return the parties to the point when the breach arose and to place the non-breaching party in as good a position as it would have been had the contract been performed.").

2003). Although we review de novo the district court's legal conclusions, we provide "an extraordinary level of deference" to the underlying arbitration award. Id. (citation omitted). Courts have absolutely no authority to reconsider the merits of an arbitration award, even when the parties allege the award rests on factual errors or on a misinterpretation of the underlying contract. Id.; see also Inter-City Gas Corp. v. Boise Cascade Corp., 845 F.2d 184, 187 (8th Cir. 1988) (acknowledging "contract interpretation is left to the arbitrator"). Even though an "arbitrator may interpret ambiguous language" in a contract without fear of judicial intervention, "the arbitrator may not disregard or modify unambiguous contract provisions." Inter-City Gas Corp., 845 F.2d at 187. The bottom line is "[w]e will confirm the arbitrator's award even if we are convinced that the arbitrator committed serious error, so long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." Schoch, 341 F.3d at 788 (citations and quotations omitted).

Although arbitrators have broad authority, their decisions are subject to limited judicial review. Id. The Federal Arbitration Act (FAA) sets forth specific reasons for vacating an arbitration award. See 9 U.S.C. § 10(a) (including corruption, fraud, or undue means in the procurement of the award, or evident partiality or corruption, misconduct, or ultra vires acts by the arbitrators). For instance, a district court may vacate an arbitrator's award if the arbitrator exceeded his or her powers. 9 U.S.C. § 10(a)(4). The reasons for vacating an arbitration award are not limited to the reasons listed in the FAA, however.

In addition to the FAA's expressed reasons for vacating arbitration awards, our court has recognized two additional, but "extremely narrow," reasons for vacating arbitration awards. Schoch, 341 F.3d at 788 (citation omitted). First, a court can vacate an arbitration award if it is "completely irrational," which means "it fails to draw its essence from the agreement." Id. (citation omitted). An arbitration award draws its essence from the agreement if the award is derived from the agreement,

viewed in light of the agreement's language and context, as well as other indications of the parties' intention. Id. Second, a court can vacate an arbitration award if it "evidence[s] a manifest disregard for the law." Id. (alteration in original) (citation omitted). An award manifests disregard for the law when an arbitrator clearly identifies the applicable, governing law, but then ignores it. Id.

## B. No Grounds to Vacate Arbitration Award

FAC contends "the plain language of the [no cause termination] provision . . . provide[s McGrann] could not receive his 2002 bonus unless employed by [FAC] on February 15, 2003."[5] FAC specifically argues, "No provision [of the agreement] allows [FAC] to pay or McGrann to receive a pro-rata share of his 2002 bonus. According to the plain language of the Agreement, the 2002 bonus <u>would not</u> be paid unless [FAC] employed McGrann on <u>February 15, 2003</u>." FAC certainly tried to persuade the arbitration panel with this argument, but the arbitration panel rejected it. FAC then reprised its views onto the district court, which rejected FAC's contention only FAC possessed the proper interpretation of the agreement. We, too, reject FAC's argument, concluding the arbitration panel was not bound by FAC's contract interpretation argument.

The first reason to reject FAC's argument is the arbitration panel was not bound by FAC's interpretation of the agreement, because the agreement was not so simplistically drawn to be free from ambiguity. Although FAC's proposed

---

[5]Actually, the no cause termination provision does not require McGrann to be employed on February 15, 2003, to receive his 2002 bonus. Instead, the no cause termination provision simply states what McGrann is entitled to receive should his employment be terminated "for any reason other than Cause . . . prior to the second anniversary of [his] employment." As the district court rightly noted, the arbitration panel was not required to adhere to FAC's self-serving interpretation of the agreement, especially when FAC's arguments distort the agreement's plain language.

interpretation–that McGrann was entitled to his 2002 bonus only if he was employed by FAC on February 15, 2003–is reasonable, it is not the only plausible interpretation.

The agreement specifically referenced FAC's discretion when it came to awarding bonuses to employees: "Generally, bonuses are based on your contribution, the performance of the firm as a whole and other important factors within our sole discretion." FAC did not have unbridled discretion, however, when it came to McGrann's bonuses. Instead, the agreement guaranteed McGrann's bonuses to the following extent: "we have agreed to pay you a bonus of not less than $500,000 for 2001 and $600,000 for 2002. Such bonuses will be payable on February 15th of the following year or on such other date as firm-wide bonuses are paid, and only if you remain employed by us at such times."

There is no doubt the agreement guaranteed the payment of the 2002 bonus in full if McGrann was employed on February 15, 2003. However, the agreement arguably is ambiguous as to payment if McGrann were not employed on February 15. A plausible interpretation is the agreement's payment date provision, which follows the bonus guarantee, simply referred to when payment would occur. For example, if McGrann were not employed on the payment date (whether that be February 15 or on the dates bonuses were paid firm-wide), then his guaranteed bonus would be paid on some other date, i.e., McGrann would not have to wait until February 15 (or another date) to receive his 2002 bonus if his employment ended earlier.

FAC responds that the combination of the bonus provision and the no cause termination provision compels a conclusion that McGrann would not be entitled to any bonus if his employment were terminated without cause before February 15, 2003. We do not read the agreement as requiring such an interpretation, because ambiguities exist. These ambiguities arise mostly out of the agreement's silence on related issues, which cast doubt on the parties' intent on the bonus issue at the heart of the arbitration and this appeal. For example, if McGrann's employment had ended

by death or resignation (as opposed to being terminated) on February 14 after having the strongest year of any FAC salesperson, did the contract's bonus provision mean his bonus was not payable? For the reasons stated above, another interpretation exists. Of course, the no cause termination provision would not apply to these situations, so only the bonus provision would control. Because a plausible interpretation of the agreement in those situations might compel FAC to pay McGrann his 2002 bonus, that interpretation could likewise apply in this case. FAC cites no legal authority requiring the arbitration panel to interpret the agreement as FAC interprets it.

The second reason to reject FAC's proposed interpretation of the agreement involves FAC's implicit promise of good faith and fair dealing. Under New York law, every contract necessarily includes a covenant of good faith and fair dealing. State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 169 (2d Cir. 2004). Under the covenant of good faith and fair dealing, each party to a contract is prohibited from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. (citation omitted). If a contract authorizes a party to exercise discretion, that party impliedly promises "not to act arbitrarily or irrationally in exercising that discretion." Id. (citation omitted). However, the implied covenant of good faith and fair dealing has limits, such that no promise "can be implied that would be inconsistent with other terms of the contractual relationship." Id. at 170 (citation omitted).

McGrann took a huge risk leaving his multi-million dollar job at Wessels to work for FAC. To induce McGrann, FAC made a number of compensation guarantees, including bonuses for 2001 and 2002. Within months of luring McGrann away from Wessels, FAC tried to slash McGrann's compensation and renegotiate the agreement. When McGrann refused to budge, FAC devised a scheme to terminate McGrann's employment and label the termination for cause to avoid any payment to McGrann. Indeed, FAC sought payment from McGrann.

It is plausible to interpret the agreement, when read with the implicit good faith and fair dealing provision, to mean FAC could not invoke the for cause termination provision in bad faith to deprive McGrann of the fruits of his agreement, including the guaranteed 2002 bonus. Although FAC generally pays bonuses based on its sole discretion, FAC guaranteed McGrann bonuses for 2001 and 2002 so he would leave his lucrative position at Wessels. We believe New York's good faith and fair dealing requirement frowns on FAC's conduct in trying to void the bonus guarantee within months of McGrann's arrival. Even the no cause termination provision, when read alongside the bonus provision and the good faith and fair dealing requirement, does not contemplate FAC terminating McGrann's employment under the guise of cause, intending to deprive McGrann of his 2002 bonus. The amounts payable under the no cause termination provision can be read to mean what McGrann would be owed if FAC terminated his employment without cause, but still acted in good faith. This did not happen here.

The arbitration panel heard testimony and viewed evidence suggesting that, almost from the beginning of the employment relationship, FAC wanted to avoid paying bonuses to McGrann. A plausible interpretation of the agreement could have led the arbitration panel to conclude FAC's breach of its duty of good faith and fair dealing required FAC to pay McGrann $500,000 of the $600,000 guaranteed bonus.

Although FAC's conduct could be considered egregious, it could have been worse. For instance, FAC could have decided in early 2002 to terminate McGrann's employment to avoid paying the 2002 bonus, but strung McGrann along to profit from his efforts. After wringing every bit of effort out of McGrann, FAC could have waited until a second before February 15, 2003, to terminate McGrann's employment. FAC's interpretation of the agreement would authorize this type of conduct without a bonus coming due. We disagree.

The final reason to reject FAC's arguments is based on an interesting–but reasonable–interpretation of the agreement. This interpretation somewhat tracks the good faith and fair dealing analysis. Arguably, the agreement contemplated FAC would discharge McGrann either for cause or without cause, but that FAC would not attempt a for cause termination to avoid paying a bonus when sufficient cause for termination does not exist. Under this interpretation, the no cause termination provision would only apply when FAC intended to terminate McGrann's employment without cause. If FAC terminated McGrann's employment under the for cause provision without justification, the no cause termination provision would not be implicated. Instead, McGrann would be entitled to breach of contract damages. Under this theory, McGrann's damages would include whatever it would take to put him in the position he would have enjoyed had FAC not terminated his employment and styled it for cause. Siegel, 763 N.Y.S.2d at 608. Interestingly, this amount could have included the entire $600,000 for the 2002 bonus.

Addressing the breach of contract remedies available to McGrann, FAC contends the no cause termination provision was meant to act as a liquidated damages provision or a limitation of liability provision. However, we would expect sophisticated parties like FAC and McGrann to be able to state clearly this intent. The agreement does not do so. The no cause termination provision does not even mention the possibility it might apply to a breach of contract claim.

FAC had two choices to ensure the agreement was interpreted the way FAC wished it to be. First, FAC could have drafted an unambiguous agreement. Second, FAC could have retained the right to litigate any issues arising out of the agreement in a court as opposed to arbitration. It did not, and the arbitration panel was not required under the facts of this case to interpret the agreement at FAC's urging.

Although a court might have interpreted the agreement differently, the parties did not submit their claims to a court. Instead, they chose arbitration. Because the

arbitration panel did not exceed its authority and its award was not completely irrational, the district court correctly confirmed the arbitration award. See Schoch, 341 F.3d at 790 ("Although we may disagree with the arbitrator's factual findings or legal analysis, our limited review does not authorize us to substitute our judgment for that of an arbitrator hired by the parties.").[6]

## III.   CONCLUSION

For the foregoing reasons, we affirm the district court's judgment in McGrann's favor confirming the arbitration award.

_____

[6]Our limited review of the arbitration award assures us no grounds require us to vacate the award. Thus, we do not consider whether the award was justified under other theories, such as defamation or violations of the NASD rules or Minnesota law.