PEST MANAGEMENT, INC., Accurase, Inc.,
RLI Insurance Company, Grant Goode, Elaine Goode,
Arkansas State Plant Board, & Daryl Little *v.*
Alfred D. LANGER & James Stalnaker

06-748 250 S.W.3d 550

Supreme Court of Arkansas
Opinion delivered February 22, 2007

[Rehearing denied March 22, 2007.]

*Roberts Law Firm, P.A.*, by: *Jeremy Swearingen, Mike Roberts*, and *Emily A. Neal*, for appellants.

*David H. Williams Law Firm, PLLC*, by: *David H. Williams*, for appellees.

*Brian G. Brooks, Attorney at Law, PLLC*, by: *Brian G. Brooks*, for amicus curiae.

JIM HANNAH, Chief Justice. Appellant Pest Management, Inc., d/b/a Accurase, appeals the denial of a motion to arbitrate the claims of Alfred Langer and James Stalnaker (collectively referred to as Langer). The Faulkner County Circuit Court found that claims arising from an inspection and inspection graph originated prior to execution of a "Standard Contract For Treatment of Wood-Destroying Insects" were not subject to the arbitration provision contained in the termite contract. The circuit court further found that any claims arising from the termite contract between the parties called for arbitration under the Arkansas Arbitration Act. The circuit court then found that any causes of action in this case sounded in tort and were thus exempted from arbitration under the terms of the Arkansas

Arbitration Act. We reverse the circuit court and hold that the Federal Arbitration Act (FAA) applies to the claims raised by Langer in this case.

This case was previously considered and decided in the Arkansas Court of Appeals. *See Pest Mgmt., Inc. v. Langer*, 96 Ark. App. 220, 240 S.W.3d 149 (2006). We granted a petition for review in this case. Thus, our jurisdiction is pursuant to Ark. Sup. Ct. R. 2-4. When we grant a petition for review, we consider the appeal as though it had originally been filed in this court. *Sundeen v. Kroger*, 355 Ark. 138, 133 S.W.3d 393 (2003).

*Facts*

On September 12, 2003, Pest Management inspected a home being purchased by Langer. Pest Management created an inspection graph on this date. In handwritten letters across the top of the graph appears the word, "TREATMENT." On September 15, 2003, Pest Management issued a letter of clearance on the home. The letter indicated no past or present wood–destroying insect damage. It further provided that the annual termite protection contract on the structure could be renewed for the sum of $115 due on September 12, 2004. On September 17, 2003, the house was purchased by Langer. On that same date Langer signed a "Standard Contract For Treatment of Wood–Destroying Insects" with Pest Management. The contract stated that from the initial date of treatment, the contract would provide protection for one year for the sum of $600, and as in the certification letter, indicated that further annual protection would be provided at the rate of $115 per year.

The inspection graph indicates that some fungus and standing water was found. The certification letter stated that a careful inspection was undertaken and that either infestation was not found or that any prior infestation found had been properly repaired. Langer asserts that he purchased the home, and the lender extended the loan in reliance on Pest Management's certification.

Langer alleges in their complaint that beginning in September 2003, they requested that Pest Management perform under its contract. They further allege that Pest Management was slow to respond, and when it did, it asserted that the house could not be treated due to insufficient crawl space, and further stated that it was Langer's responsibility to excavate beneath the house to create sufficient crawl space. Langer contacted the Arkansas State Plant

Board, which oversees pest control companies such as Pest Management. The Plant Board sent out an inspector who likewise found that a full inspection was not possible due to insufficient crawl space; however, he did find that there were various conditions that needed to be remedied and that there was rot in floor joists. A "Report of Sub-Standard Termite Treatment" was issued to Pest Management by the State Plant Board stating that Pest Management must bring the treatment up to standards with respect to problems noted on the report. In June 2004, Pest Management began work and removed a section of the floor to allow access to excavate and create a sufficient crawl space. Langer asserts that while they were initially told by Pest Management that the floor would be replaced within three days, the work revealed to Pest Management that the damage to the floor joists and framing was extensive and might involve most of the house. Langer asserts that Pest Management refused to carry out any further repairs and that they were damaged by not only the damage that should have been discovered, but suffered significant other damages likely exceeding the value of the house.

## Standard of Review

An order denying a motion to compel arbitration is immediately appealable. Ark. R. App. P. – Civ. 2(a)(12); *Nat'l Cash, Inc. v. Loveless*, 361 Ark. 112, 205 S.W.3d 127 (2005). We review a circuit court's order denying a motion to compel de novo on the record. *Nat'l Cash, supra*.

## Terms of the Contract

The only point on appeal is whether the circuit court erred in denying the motion to compel arbitration under the Federal Arbitration Act. We must first consider Langer's argument that no form of arbitration applies. They argue that the inspection on September 12, 2003, including the resulting inspection graph and later letter of clearance, are not part of or controlled by the provisions of the "Standard Contract For Treatment of Wood-Destroying Insects." This contract contains the arbitration provision Pest Management wishes to enforce. The circuit court agreed with Langer and found that the contract did not "control disputes relating to the performance of the Plaintiffs' house inspection or the reporting of its condition on the Inspection Graph or Clearance Letter, occurring prior to the execution of the termite contract." Langer argues that Pest Management is separately liable

in tort on these issues. Langer further argues that there was no contract of any form between them and Pest Management when Pest Management inspected and issued the certification letter. However, while Langer argues there was no contract, they indicate in their brief that they requested Pest Management to undertake the inspection. Obviously, there was a contract of some form between Langer and Pest Management. The question is whether there was only the one contract containing the arbitration agreement or a prior contract concerning only inspection and issuance of the graph and clearance letter, which did not include an arbitration agreement.

We note first that pest control services are regulated by the State through the State Plant Board. Ark. Code Ann. §§ 17-37-101 to -221 (Repl. 2001). Pursuant to Ark. Code Ann. § 17-37-105(a)(2)(A) (Repl. 2001), the State Plant Board is empowered to adopt rules and regulations having the full force and effect of law in carrying into effect the provisions of the Arkansas Code on pest control services. State Plant Board regulations cover the activities of pest control operators, including contracts and issuance of letters of clearance. Rules & Regulations of the State Plant Board, 003-11-011 Ark. Code R. § II(4) (WEIL 2004) provides the following:

> Letters of clearance must be accompanied by a signed contract providing a guarantee of at least one year and a graph or diagram showing, if present, the location of active or inactive wood destroying insect infestations and visible damage. If present, conditions existing to the substructure favorable to decay fungi and possible damage due to rot must be disclosed in the additional comments section on the form.

The letter should also clearly describe any areas inaccessible for inspection.

The "Standard Contract For Treatment of Wood-Destroying Insects" shows execution by Langer and Stalnaker on September 17, 2003. It indicates that a graph comprises part of the contract, and the contract shows the name Elaine Goode as representative of Pest Management, and a date of September 12, 2003. The referenced graph shows an inspection date of September 12, 2003, and notes at the top "Treatment," in handwritten letters. The letter of clearance shows a date of September 12, 2003, next to Elaine Goode as operator in charge but also bears the date September 15, 2003, directly beneath the following sentence:

"This property has been ___ treated ___ pre-treated by Pest Management, Inc." The quality of the copies of the letter of clearance included in the record do not permit a determination of whether either treated or pre-treated was checked on the original document.

The "Standard Contract For Treatment of Wood-Destroying Insects" provides that for the sum of $600, Pest Management will provide treatment and protection as set out in the contract. It also indicates that the contract can be renewed each year by payment of $115 on or before the end of the previous annual period. The graph created on September 12, 2003, consistently indicates that the termite protection contract can be renewed by payment of $115 at the time of the annual inspection, and the next annual inspection is noted as due on September 12, 2004, one year from the inspection at issue in this case.

The facts show that, pursuant to the above noted regulations, the letter of clearance was issued along with a contract providing a guarantee of at least one year, a graph or diagram purporting to show no current termite problems, and the location of fungi and conditions detrimental to the substructure. The inspection, the graph, and the letter of clearance were created, issued, and are controlled by the "Standard Contract For Treatment of Wood-Destroying Insects" executed by Langer and Stalnaker on September 17, 2003. The State Plant Board inspection report is consistent with this conclusion. It indicates that what is at issue is "substandard termite treatment," and shows September 12, 2003, as the date of the inspection and creation of the graph, and as the "date treated." The State Plant Board ordered Pest Management to, among other things, provide clearance and access, and repair the home. The report contains the following instruction:

> TO THE OPERATOR: Please bring the treatment up to standard with respect to the items noted above. In addition, please make a thorough examination and should you find that the inspector has overlooked any other defects in the work, please correct these also. Then, return this sheet to the Board, after having noted in the space below, in detail, just what you have done, not later than 15 days after the date of this notice, keeping duplicate for your files. The Board will then reinspect as soon as possible.

Clearly, the "Standard Contract For Treatment of Wood-Destroying Insects" included the initial inspection, or "treatment" as it is referred

to in the regulations and by the State Plant Board, and creation of the graph and the clearance letter. As required, the contract provided a year guarantee and an option to renew the contract yearly. There is no merit to Langer's claim that the inspection, graph, and letter of clearance were not issued pursuant to the "Standard Contract For Treatment of Wood-Destroying Insects." The circuit court erred in its contrary finding.

### Arbitration

 We now turn to the arbitration agreement contained in the contract. The contract contains a section entitled "ARBI-TRATION," which provides:

> Customer and Pest Management agree that any claim, dispute or controversy between them or against the other or the employees, agents or assigns of the other, and any claim arising from or relating to this Contract or the relationships which result from the Contract, no matter against whom made, including the applicability of this arbitration clause and the validity of the entire Contract, shall be resolved by neutral binding arbitration by the National Arbitration Forum . . . under the Code of Procedure of the National Arbitration Forum in effect at the time the claim is filed. . . . Each party shall be responsible for paying its own fees, costs and expenses and the arbitration fees as designed by the Code of Procedure. The decision of the arbitrator shall be a final and binding resolution of the disagreement that may be entered as a judgment by a court of competent jurisdiction. The arbitration agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. § 1 – 9 U.S.C. § 16. Each party consents to the personal jurisdiction and venue of the courts in which the property is located and the courts of the State of Arkansas and the U.S. District Court for the Eastern District of Arkansas. Judgment upon the award may be entered in any court having jurisdiction. Neither party shall sue the other party with respect to any matter in dispute between the parties other than for enforcement of this arbitration provision or of the arbitrator's decision, and a party violating this provision shall pay the other party's costs, including but not limited to attorney's fees, with respect to such suit and the arbitration award shall so provide. THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE DIS-PUTES THROUGH A COURT AND TO HAVE A JUDGE

OR JURY DECIDE THEIR CASE, BUT THEY CHOOSE TO HAVE ANY DISPUTES DECIDED THROUGH ARBITRA- TION.

The contract specifically provides that the arbitration provision and the inspection graph are part of the contract. The requirement of arbitration is broad and requires that any claim, dispute or controversy between them or against the other or the employees, agents or assigns of the other, and any claim "arising from or relating to this Contract or the relationships which result from the Contract, no matter against whom made, including the applicability of this arbitration clause and the validity of the entire Contract, shall be resolved by neutral binding arbitration." The intent to arbitrate any claims arising from the contractual agreement is clear. Even if the intent were not clear, any doubts and ambiguities must be resolved in favor of arbitration. *Tyson Foods, Inc. v. Archer*, 356 Ark. 136, 147 S.W.3d 681 (2004). Arbitra- tion is strongly favored in Arkansas as a matter of public policy and is looked upon with approval by courts as a less expensive and more expeditious means of settling litigation and relieving docket conges- tion. *Cash In A Flash Check Advance v. Spencer*, 348 Ark. 459, 74 S.W.3d 600 (2002). The disputes in this case are subject to arbitration.

However, the circuit court also found that Langer's claims sound in tort and thus are not subject to arbitration in any event because tort claims are not subject to arbitration under the Arkan- sas Arbitration Act. Ark. Code Ann. §§ 16-108-201 to -222 (Repl. 2006). The circuit court also relied on *Terminix International Co. v. Stabbs*, 326 Ark. 239, 930 S.W.2d 345 (1996), in this regard. However, *Terminix* concerned application of the Arkansas Arbi- tration Act,[1] not a contract applying the FAA.

Under *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281 (1995), the FAA applies if the transaction involves "interstate commerce, even if the parties did not contemplate an interstate commerce connection." In *Allied-Bruce*, the Court held that the FAA applied to a termite protection agreement and required enforcement of its arbitration provision. The Court stated that the language of the FAA makes an arbitration provision enforceable in "a contract evidencing a transaction involving

---

[1] *Cash In A Flash Check Advance v. Spencer*, 348 Ark. 459, 74 S.W.3d 600 (2002), also concerned an issue under the Arkansas Arbitration Act and found that tort claims were not subject to arbitration under the Act.

commerce" "to the limits of Congress' Commerce Clause power." *Id.* at 268. Further, in the present case, the parties contracted that the subject matter concerned a "transaction in-volving interstate commerce."[2] This case is subject to arbitration under the FAA.

Reversed and remanded.

---

[2] Parties to a contract are free to contract upon any terms not contrary to public policy or the terms of our statutes. *Lewis v. Mid-Century Ins. Co.*, 362 Ark. 591, 161 S.W.3d 298 (2005); *Travelers Ins. v. Nat'l Farmers Union*, 252 Ark. 624, 480 S.W.2d 585 (1972).