# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2596

_____

David Hudson and Donna Hudson,     *
                                    *

        Plaintiffs-Appellants,     *

                                    *   Appeal from the United States

     v.                             *   District Court for the Western

                                    *   District of Arkansas.

ConAgra Poultry Company,       *

                                      *

        Defendant-Appellee.     *

_____

Submitted: December 7, 2006
Filed: April 4, 2007

_____

Before WOLLMAN, BYE, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Plaintiffs David Hudson and Donna Hudson ("the Hudsons") entered into a contract to raise chickens for ConAgra Poultry Company ("ConAgra"). Disputes eventually arose between the parties, which culminated in ConAgra's cancellation of the contract and the Hudsons' decision to file for arbitration of their breach-of-contract claims. Following a decision by an arbitration panel, the Hudsons filed tort claims against ConAgra in state court. ConAgra removed the case to federal court on

the basis of diversity jurisdiction, and the district court[1] compelled arbitration of the Hudsons' tort claims against ConAgra. The arbitration panel found that the Hudsons' tort claims were barred by res judicata and therefore granted ConAgra's motion for summary disposition. The Hudsons moved to vacate, modify, or correct the arbitration order, and the district court[2] denied the motion. The Hudsons appeal the district court orders compelling arbitration and denying their post-arbitration motion to vacate, modify, or correct the award. We affirm.

## I. BACKGROUND

The Hudsons own and operate a farm in Claiborne Parish, Louisiana. ConAgra had poultry processing plants in nearby Arcadia, Louisiana, and El Dorado, Arkansas. ConAgra representatives approached the Hudsons in 1992 to form a business arrangement. ConAgra and the Hudsons entered into an agreement whereby ConAgra would deliver chicks to the Hudsons, the Hudsons would feed and raise the chicks to adult size, and ConAgra would return later to collect the full-grown birds. The Hudsons constructed chicken houses suitable for performance under the agreement. The parties maintained their relationship for several years under a series of "flock-to-flock" contracts, each lasting the duration of one delivery of chicks to one pick-up of adult chickens. The parties signed the one-flock agreement at issue in this case (the "Broiler Grower Agreement" or "BGA") in 1999. ConAgra drafted the contract.

The BGA contained an arbitration clause governing "[a]ll claims . . . arising out of or relating in any way to the negotiation, execution, interpretation, and performance" of the contract. It also contained a separate choice-of-law provision

---

[1]The Honorable Harry F. Barnes, United States District Judge for the Western District of Arkansas.

[2]The Honorable Jimm Larry Hendren, Chief Judge, United States District Court for the Western District of Arkansas.

stating that "[t]he laws of Arkansas . . . shall exclusively apply and govern this agreement." In addition, the BGA set forth different rates of compensation depending upon whether the Hudsons chose to retrofit their chicken houses to meet new ConAgra specifications. This two-tiered compensation provision was absent from prior agreements between the parties, and ConAgra alleges that it was a uniform addition in its contracts with other growers that year.

The Hudsons objected to retrofitting their houses and to the lower compensation for chickens raised in facilities that were not retrofitted, which they said placed them at a competitive disadvantage. Numerous disputes followed. The Hudsons alleged that ConAgra was intentionally tardy in picking up the full-grown birds, while ConAgra alleged that Mr. Hudson brandished a firearm and threatened ConAgra associates when they visited the farm. Citing this latter incident, ConAgra terminated the BGA on January 17, 2000.

Six months later, the Hudsons filed a demand for arbitration pursuant to the arbitration clause of the BGA. The Hudsons claimed that ConAgra breached the contract in several respects, including untimely pick-up of the chickens, institution of the two-tiered compensation system (which, according to the Hudsons, conflicted with other compensation provisions of the BGA), and the ultimate termination of the BGA. An arbitration panel ruled in favor of ConAgra on all grounds in September of 2001. The Hudsons do not appeal any issues relating to the disposition of their breach-of-contract claims.

On January 2, 2003, the Hudsons brought tort claims in Arkansas state court alleging that several of ConAgra's actions during the course of their business relationship violated the Arkansas Deceptive Trade Practices Act. Ark. Code Ann. §§ 4-88-101 *et seq.* ConAgra removed the case to the United States District Court for the Western District of Arkansas and moved to compel arbitration, citing the arbitration

provision of the BGA. The district court granted the motion, finding that the language of the parties' arbitration provision encompassed the Hudsons' tort claims.

The parties proceeded to a second arbitration. On January 23, 2006, a second arbitration panel granted ConAgra's motion for summary disposition on the basis of res judicata. The Hudsons moved the district court to vacate, modify, or correct the second arbitration award, arguing that the panel in this second arbitration improperly refused to hear evidence of their tort claims, that the claims should not have been subjected to arbitration, and that the arbitrators erred in applying res judicata to bar the claims. The district court denied their motion. The Hudsons appeal that denial, as well as the district court's prior grant of ConAgra's motion to compel arbitration.

## II. DISCUSSION

The Hudsons raise two primary issues on appeal. First, they argue that the district court erred in compelling arbitration of their tort claims because "[w]ritten agreements to arbitrate have no application to tort matters" under the Arkansas Uniform Arbitration Act. Terminix Int'l Co. v. Stabbs, 930 S.W.2d 345, 347 (Ark. 1996); Ark. Code Ann. § 16-108-201(b)(2). Second, the Hudsons argue that the district court erred by failing to modify the second arbitration panel's finding that res judicata precluded the tort claims. We address these issues in turn.

A. Arbitrability of the Hudsons' Tort Claims

We review a district court's interpretation of a contractual arbitration provision de novo. Kelly v. Golden, 352 F.3d 344, 349 (8th Cir. 2003). The Federal Arbitration Act governs contracts involving interstate commerce. Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 273, 281 (1995). Under the Federal Arbitration Act, we generally construe broad language in a contractual arbitration provision to include tort claims arising from the contractual relationship, and we compel arbitration of such

claims. See CD Partners v. Grizzle, 424 F.3d 795, 800 (8th Cir. 2005) ("Broadly worded arbitration clauses such as the ones at issue here are generally construed to cover tort suits arising from the same set of operative facts covered by a contract between the parties to the agreement."). Nevertheless, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (quoting Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582 (1960)) (internal marks omitted).

"When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Here, the parties decided that "[t]he laws of Arkansas . . . shall exclusively apply and govern this agreement." Arkansas courts look to the parties' intent, as expressed in their agreement, to determine the question of arbitrability, and, under Arkansas law, "any doubts and ambiguities must be resolved in favor of arbitration." Pest Mgmt., Inc. v. Langer, No. 06-748, 2007 WL 538178, slip op. at 8-9 (Ark. Feb. 22, 2007).

There is no question that the BGA was a contract involving interstate commerce and contained an arbitration provision, and it is therefore governed by the Federal Arbitration Act. Further, there is no question that the Hudsons' tort claims fall within the language of the arbitration provision of the BGA, which calls for arbitration of "[a]ll claims . . . relating in any way" to performance of the contract. On its face, the arbitration provision is both broad and unambiguous. Therefore, absent some indication that the parties intended to limit the scope of arbitrable matters more narrowly than the bare language of the arbitration provision suggests, we would find that the district court was correct in compelling arbitration. See Pest Mgmt., Inc., No. 06-748, 2007 WL 538178, slip op. at 8-10 (finding, under Arkansas law, that a broad

arbitration provision showed the clear intent of the parties to arbitrate all claims arising from their contract, including tort claims).

We first turn to the language of the BGA as a whole to determine whether there is any indication of an intent to narrow the scope of the arbitration provision. Initially, we note that nothing in the BGA explicitly excludes tort claims from the reach of the broadly worded arbitration provision; indeed, there is no language that explicitly modifies the scope of arbitrable matters at all, aside from the broad language of the arbitration provision itself. The BGA's choice-of-law provision, however, warrants further discussion relating to the parties' intent. Because contractual arbitration provisions do not apply to tort claims under the Arkansas Uniform Arbitration Act, see Terminix Int'l Co., 930 S.W.2d at 347, the choice-of-law provision and arbitration provision are arguably in conflict with each other. Under one interpretation—the interpretation urged by the Hudsons—these provisions create the implication that the parties intended to arbitrate only those claims that would be arbitrable under Arkansas law. This interpretation would exclude tort claims. Under a second interpretation, these provisions create the implication that the parties intended to arbitrate all claims regardless of their arbitrability under Arkansas law, but wished to apply the substantive law of Arkansas to determine liability for those claims.

The Supreme Court has encountered a similar issue in two cases. See Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52 (1995); Volt Info. Scis., Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ., 489 U.S. 468 (1989). Volt and Mastrobuono both address the problem of harmonizing a broad arbitration provision with a choice-of-law provision that designates the law of a state with arguably narrower arbitration rules than those of the Federal Arbitration Act. In both cases, the Court faced the task of determining the parties' intent regarding the meaning of their contractual arbitration provisions.

In Volt, the plaintiff university and the defendant contractor entered into a contract for services in California whereby they agreed to submit all disputes to arbitration; the contract also contained a choice-of-law provision designating "the law of the place where the Project is located" to govern the contract. Volt Info. Scis., Inc., 489 U.S. at 470. A dispute arose and the contractor filed a demand for arbitration. Id. While this arbitration claim was pending, the university filed claims against the contractor and other parties (with whom it did not have arbitration agreements) in state court, and the contractor sought to compel arbitration of those claims pursuant to the contract. Id. at 470-71. The university, meanwhile, moved the court to stay the original arbitration proceedings with the contractor, as allowed by the arbitration rules of California; the Federal Arbitration Act is silent as to whether a court can take such action. Id. at 471-72. The state court refused to compel arbitration of the university's claims against the contractor and stayed the prior, ongoing arbitration of the contractor's claims against the university. Id. at 471. The California Court of Appeal affirmed, holding that the parties' inclusion of the choice-of-law provision in their contract evinced their intent to be bound by California's rules of arbitration. Id. at 471-72.

The Supreme Court affirmed this decision. According to the Court, while "due regard must be given to the federal policy favoring arbitration . . . [t]here is no federal policy favoring arbitration under a certain set of procedural rules." Id. at 476. The California rules were "manifestly designed to encourage resort to the arbitral process," id. at 476, and even if they did not serve that goal in the case at hand, the Court ruled that parties to a contract have the authority to "specify . . . the rules under which [their] arbitration will be conducted." Id. at 479. In short, because "the interpretation of private contracts is ordinarily a question of state law, which [federal courts] do[] not sit to review," id. at 474, and because that interpretation did not contradict federal law governing arbitration, id. at 478-79, the state court did not err in finding that the parties intended to arbitrate disputes according to state rules and procedure.

In Mastrobuono, decided six years after Volt, the Supreme Court confronted a similar issue. In that case, the plaintiff investors entered into a contract with the defendant investment firm. Mastrobuono, 514 U.S. at 54. As in Volt, the contract included both an arbitration provision and a choice-of-law provision. Id. The investors sued the firm in federal district court in Illinois, and the court granted the firm's motion to compel arbitration under the contract. Id. This victory proved unfortunate for the firm, as the arbitration panel ultimately ruled in favor of the investors and awarded significant punitive damages. Id. The district court vacated the award of punitive damages because the law of the parties' chosen state—New York—did not allow arbitrators to award punitive damages, and the Seventh Circuit affirmed. Id. at 54-55.

On appeal to the Supreme Court, the parties argued over contract interpretation. The Court held that the mere inclusion of a choice-of-law provision designating the law of a state that does not allow arbitrators to award punitive damages does not, without more, show the clear intent of the parties to preclude arbitrators from awarding punitive damages. Id. at 62. The Court noted that neither provision directly expressed such an intent; therefore, "[a]t most, the choice-of-law clause introduces an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards." Id. Because "'ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration,'" id. (quoting Volt Info. Scis., Inc., 489 U.S. at 476), the Court held that it was improper to interpret the contract as limiting arbitrators' power to award punitive damages. Id. at 62-63. As the dissent noted, this holding seemed to conflict with Volt, where the contract contained broad, nearly identical arbitration and choice-of-law provisions. Id. at 65-67 (Thomas, J., dissenting). The Court defended its departure from Volt, in part, by noting the different procedural history of the two cases: in Volt, the Court was reviewing a state court's construction of a contract under state law, an interpretation to which it owed deference, whereas in Mastrobuono the Court was reviewing a federal court's interpretation of a contract and therefore examined the contract de novo. Id. at 60 n.4.

-8-

The district court construed the arbitration provision in the present case to encompass contract-related tort claims, and we agree with this construction. At the outset, we question whether there is any ambiguity at all as to the scope of the arbitration provision. The provision's language is clear, broad, and unqualified, and it encompasses the Hudsons' tort claims. The choice-of-law provision appears in a different section of the BGA, and the arbitration and choice-of-law provisions make no reference to each other.

Further, to the extent the presence of the choice-of-law provision introduces ambiguity into the meaning of the arbitration provision, we resolve that ambiguity in favor of a broad interpretation of the arbitration provision because we find this case to be more analogous to Mastrobuono than Volt. First, unlike the Supreme Court in Volt, we owe no deference in this case to a lower-court decision that interpreted the contract as incorporating state arbitration rules in the parties' arbitration agreement. Second, while the contracts in Mastrobuono, Volt, and the present case all arguably contain some ambiguity as to whether the parties intended for state law to define the scope of their respective arbitration provisions, Volt is the only one of the three in which the applicable state law was "manifestly designed to encourage resort to the arbitral process." Volt, 489 U.S. at 476. In both Mastrobuono and the present case, resolving any ambiguity in favor of finding that the parties intended to apply state law to the arbitration process would have the opposite effect; such an interpretation would restrict the parties from bringing certain claims or seeking certain remedies in arbitration that they could have otherwise sought in court. Parties are free to fashion their arbitration agreements in this restrictive manner. When those parties leave their contracts ambiguous on this point, however, and those contracts involve interstate commerce, we continue to interpret "any doubts concerning the scope of arbitrable issues" under the contracts "in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983).

The Hudsons argue that this policy conflicts with another longstanding rule of contract construction: courts construe ambiguities in a contract against the drafting party. They point to the Court's analysis in Mastrobuono, which includes a paragraph noting that the firm drafted the agreement and therefore created the ambiguity, a fact giving further support to the Court's decision in favor of the investors' interpretation. Mastrobuono, 514 U.S. at 62-63. We note that this common-law rule of construction would favor the Hudsons' interpretation, but it cannot overcome the statutory rule of construction favoring arbitration as embodied by the Federal Arbitration Act. Furthermore, the rule cited by the Hudsons conflicts with another common-law rule of construction noted by the Court in Mastrobuono: "a document should be read to give effect to all its provisions and to render them consistent with each other." Id. at 63. Here, the exclusion of the Hudsons' tort claims from the scope of arbitrable matters conflicts with the parties' agreement that "[a]ll claims . . . arising out of or relating in any way to the negotiation, execution, interpretation, and performance" would be subject to arbitration. Under the circumstances, we give the direct statement of the parties' intent in the arbitration provision greater weight than the indirect insinuation of a contrary intent that arguably arises from the choice-of-law provision. We therefore agree with the district court that the arbitration and choice-of-law provisions in the present case are best harmonized by interpreting the choice-of-law provision in the same fashion as the Court in Mastrobuono: "to read 'the laws of the [chosen state]' to encompass substantive principles that [state] courts would apply," but not to include limitations on the scope of arbitrable matters. Id. at 64. Therefore, we hold that the district court did not err in compelling arbitration of the Hudsons' tort claims.

B. Refusal to Vacate, Modify, or Correct the Arbitration Decision

The Hudsons also argue that, even if their tort claims had been subject to arbitration under the BGA, the district court should have granted their motion to vacate, modify, or correct the decision of the arbitration panel. Specifically, they argue that the arbitration panel misapplied the law in dismissing their tort claims on the basis of res judicata.

We apply de novo review to a district court's refusal to vacate, modify, or correct an arbitration award on legal grounds, First Options of Chicago, Inc., 514 U.S. at 947-48, but note that the district court is bound to give "an extraordinary level of deference" to the underlying arbitration award. Schoch v. InfoUSA, Inc., 341 F.3d 785, 788 (8th Cir. 2003) (quotation and internal marks omitted). The recognized grounds for vacating, modifying, or correcting an arbitration award are limited, and only three are arguably relevant in this case.

First, the Federal Arbitration Act allows a district court to vacate an arbitration award "where the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). The Hudsons argue that the arbitrators had no authority to decide their tort claims, and therefore the district court should have vacated the award. This argument mirrors the Hudsons' argument that the district court erred in compelling arbitration, and warrants no further discussion. Second, the Federal Arbitration Act also allows a district court to vacate an arbitration award "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). Here, the second arbitration panel faced the initial controversy of whether res judicata barred the Hudsons' subsequent tort claims. The arbitrators accepted ConAgra's motion to dismiss on this basis, as well as the Hudsons' response to the motion. There is no evidence that the second arbitration panel failed to consider the arguments presented by each party. It is true that the arbitrators did not hear evidence relating to the substance of the Hudsons' tort claims, but it would make little sense for

-11-

the arbitration panel to hear such evidence if it had already determined that such claims were barred by res judicata.

Our court has also recognized grounds for vacating an arbitration award that are not expressed in the Federal Arbitration Act itself, only one of which applies here. We have said that a district court "can vacate an arbitration award if [the award] evidences a manifest disregard for the law." McGrann v. First Albany Corp., 424 F.3d 743, 749 (8th Cir. 2005) (quotation and alteration omitted). We do not find evidence of a manifest disregard for the law in this case, for the reasons discussed below.

As noted by the Hudsons,

> [r]es judicata bars relitigation of a subsequent suit when (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) the first suit was fully contested in good faith; (4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies.

Winkler v. Bethell, 210 S.W.3d 117, 122 (Ark. 2005). As to the fourth element above, "[t]he doctrine bars not only the relitigation of claims which were actually litigated in the first suit, but those which could have been litigated." Cater v. Cater, 846 S.W.2d 173, 175-76 (Ark. 1993).

The factual premises underlying the Hudsons' tort claims overlap significantly with the factual premises underlying their contract claims, and all but one of the tort claims involve alleged misconduct by ConAgra in the inducement to enter, performance under, and termination of the BGA. Such claims could have been litigated in the first arbitration, and therefore the application of res judicata by the second arbitration panel did not amount to a "manifest disregard" for the law.

-12-

The remaining claim consists of an allegation that ConAgra inhibited the Hudsons' efforts to sell their farm after termination of the BGA, which caused the Hudsons to lose their farm to foreclosure and, subsequently, to file for bankruptcy. On these facts, any tortious activities by ConAgra that inhibited the Hudsons' efforts to sell their farm had ceased at least by June of 2001, when the Hudsons filed their bankruptcy petition. Although the Hudsons filed their initial demand for arbitration in June of 2000, the arbitration panel did not rule on the Hudsons' contract claims in the first arbitration proceeding until September of 2001. It is possible that ConAgra's alleged acts in preventing the sale of the Hudsons' farm did not commence until after the time the Hudsons filed their initial demand for arbitration, or that the arbitrators would not have allowed the Hudsons to add these allegations to their arbitration claim prior to the panel's decision in 2001. Either of these facts would weigh against a finding that the Hudsons could have litigated this claim in the initial arbitration proceeding. The record does not contain evidence of such facts,[3] however, and therefore we cannot say that the panel manifestly disregarded the law in finding that res judicata barred the Hudsons' claim of post-termination tortious conduct by ConAgra.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

_____

---

[3]In fact, the record suggests the opposite. After filing for bankruptcy in June of 2000, the Hudsons sent two letters to the arbitration panel: one in October of 2000 that restated the matters they sought to arbitrate, and one in November of 2000 that clarified and added to the previous letter.